The STATE of Ohio, Appellee,

v.

WHITE, Appellant.

[Cite as *State v. White* (1999), 135 Ohio App.3d 481.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 74798.

Decided Nov. 1, 1999.

*Dominic Delbalso,* Assistant Prosecuting Attorney, for appellee.

*Kenneth D. Myers* and *Avery S. Friedman,* for appellant.

PATTON, Judge.

A jury found defendant Michael White guilty of kidnapping and seven counts of rape. In this appeal, he complains that the court erred by (1) sentencing him to the maximum term, (2) entering a judgment on a guilty verdict when the evidence failed to support a finding of guilt on some of the rape counts, (3) failing to merge the kidnapping count with the rape counts, and (4) convicting him despite ineffective assistance of counsel.

The victim testified that she had been attending a New Year's Eve party with her brother and the brother's girlfriend. The three left the party in the early morning hours. The brother decided to spend the night with his girlfriend, so the victim decided to take a bus home. While she was walking to the bus stop near the Case Western Reserve University campus, a red sport utility vehicle driven by defendant pulled alongside her. Defendant asked if she needed a ride. The victim refused and continued to the bus stop. While at the bus stop, she saw defendant drive by several times. The victim became anxious, so she went to a pay phone and paged her brother using a special code that indicated an emergency. The brother called back immediately, and the victim told him that a man had been following her. They agreed they would meet halfway to the girlfriend's apartment.

As the victim walked to meet her brother, defendant grabbed her and told her he had a gun and would kill her if she did not obey him. He dragged her across the university campus and down a stairwell. He attempted to rape her from behind, but, the victim, said he could not penetrate her, so he "tried to put his fingers around that area." While this occurred, the victim saw a car pass by and screamed for help. Defendant told the victim he would kill her if she called out again.

Frustrated with his inability to penetrate the victim, defendant demanded that she perform oral sex. Defendant entered the victim's mouth, but she refused to fellate him. He then spun her around and again attempted to enter her from behind. Defendant continued to have difficulty, although the victim said she could feel him against the opening of her vagina. Defendant also digitally penetrated her. He then forced her to perform oral sex until he climaxed.

Despite freezing temperatures and three inches of fresh snow, defendant took the victim's coat and left her face down in the stairwell, telling her he knew where she lived and would kill her if she told anyone about the rape. The victim saw

snowplows plowing a nearby parking lot. She flagged down one of the plows and told the driver she had just been raped. As she sat in the cab of the snowplow, she saw defendant's vehicle parked nearby. Another snow plow driver took down the license number.

The police traced the license number to defendant. They arrived at his house the following day and observed him trying to flee from a side door of his house when they knocked on the door. Defendant told the police he did not remember what happened that evening because he had been drunk at his cousin's house. When asked to identify his cousin by name and address, defendant remained silent. The victim later identified defendant from a lineup. Subsequent DNA testing of semen found on the victim confirmed that it had come from defendant. Photographs taken the day after the rape showed numerous bruises on the victim's knees, thighs, arms, and neck.

Defendant testified that he and his cousin had been drinking earlier on the day in question, but that he was not drunk during the evening. He said that he attended a New Year's Eve party until about midnight before leaving to travel to another bar. Finding that bar too crowded, defendant left and was driving home when he saw the victim walking. She waved to him and he pulled over. She told defendant she was drunk and needed a ride home. She entered the truck and asked defendant if he had any drugs. Defendant replied in the negative, but told her he had some money because "I don't know if she was propositioning or not, but I just said I had money because that's what usually happens." He then pulled the truck over, and the victim performed oral sex. She then exited the truck, falling as she did so.

The jury found defendant guilty of rape and kidnapping and acquitted him of aggravated robbery charges relating to the theft of her coat. The court sentenced defendant to maximum terms of ten years' actual incarceration on each count, ordering the sentencing on Counts 1 and 2 to be served consecutively, and both served concurrently with the sentence on Count 3. The court further ordered defendant to serve sentences on Counts 4 through 8 consecutively, for a total confinement time of seventy years actual incarceration.

## I

The first assignment of error complains that the court erred by imposing the maximum ten-year sentence for rape and kidnapping without first considering whether the minimum sentence was appropriate and without making the required findings to justify the maximum sentence.

The overriding purposes of Ohio's new felony sentencing scheme are "to protect the public from future crime by the offender and others and to punish the

offender." R.C. 2929.11(A). Unless a mandatory prison term is required, a court that imposes a sentence upon an offender for a felony has discretion within statutory limits to determine the most effective way to comply with the purposes and principles of sentencing set forth in R.C. 2929.11. R.C. 2929.12(A). As a starting point, an offender who has not previously served a prison term must be sentenced to the minimum prison term provided unless the court finds that the shortest allowable term would either demean the seriousness of the offense or would not adequately protect the public from future crime by the defendant or others. R.C. 2929.14(B). The ending point, a maximum sentence, may be imposed upon a finding that the offender committed the worst form of the offense or poses the greatest likelihood of recidivism. R.C. 2929.14(B).

■ To impose the maximum sentence, the court must find on the record that the offender posed the greatest likelihood of recidivism or committed the worst form of the offense. See *State v. Banks* (Nov. 20, 1997), Cuyahoga App. No. 72121, unreported, 1997 WL 723309; *State v. Beasley* (June 11, 1998), Cuyahoga App. No. 72853, unreported, 1998 WL 308102. We do not require the court to utter any magic or talismanic words, but it must be clear from the record that the court made the required findings. See *State v. Stribling* (Dec. 10, 1998), Cuyahoga App. No. 74715, unreported, 1998 WL 855598.

## A

■ R.C. 2929.14(B) requires the court to impose the minimum sentence upon an offender who has not previously served prison time "unless the court finds on the record that the shortest prison term will demean the seriousness of the offender's conduct or will not adequately protect the public from future crime by the offender or others."

In this case, it appears that defendant had not previously served a prison term. Accordingly, the court had the duty to consider whether a minimum prison term must be imposed. In its sentencing entry, the court stated, "Consecutive sentences are appropriate and necessary to protect the public and not demean the seriousness of the conduct and its effect upon the victim." This language is consistent with that contained in R.C. 2929.14(B), and we cannot find by clear and convincing evidence that the record fails to support the court's findings. See R.C. 2953.08(G)(1)(a).

## B

■ The next issue is whether the record adequately justifies the court's decision to impose the maximum sentence. When discussing the case during sentencing, the court stated:

"And this Court holds that there is separateness in this case. This victim was at a bus stop at the base of Cedar Hill and she was literally chased out of that area. She was eventually captured and then she was taken by force and violence from one part of the Case Western Reserve University campus to another part of the campus where unspeakable crimes were committed upon her.

"This event was her worse [sic] nightmare and for those in public transportation in and through urban college campuses a fear of this event is uppermost. In this case the victim was plucked from the bus station even though there were two other individuals present, obviously fearing for their lives."

In order to impose a maximum sentence, the court had to find that defendant either committed the worst form of the offense or posed the greatest likelihood of recidivism. The court's statements show that the court believed that defendant had committed the worst form of the offense, for it remarked that defendant committed "unspeakable crimes" that were the victim's worst nightmare. Defendant stalked the victim at a public bus stop, threatened her, and abducted her. He continually forced himself upon her, refusing to abandon his crimes when it became apparent that he could not complete intercourse. In the process he humiliated and debased the victim. When he completed his crimes, he took the victim's coat and abandoned her on a freezing night.

It may be no comfort to the victims of crimes to hear the courts say that one form of an offense is worse than others, but a judicial determination that an offender committed the worst form of the offense is not meant to diminish the impact on all victims who suffer the indignity of crime. This judicial weighing of the relative impact of crimes evinces a legislative determination that some offenders deserve more punishment under certain circumstances than others. The impact of crime may be widely felt, and the courts would be remiss if they were to ignore, when judging the severity of the form of the offense, the impact the crime has on a victim. The victim in this case gave a compelling and humbling statement of how defendant's crimes affected her and her family. In response, defendant accused the victim of lying and told the court he would serve his sentence as a sacrifice to all those falsely accused of crimes. The court concluded that the offense had been a nightmare for the victim. Given the manner in which defendant committed the offenses, the impact on the victim and defendant's lack of remorse, we cannot find by clear and convincing evidence that the court abused its discretion by sentencing defendant to the maximum term of incarceration. The first assignment of error is overruled.

## II

In his second assignment of error, defendant complains that the jury lacked sufficient evidence to find him guilty of seven different counts of rape. He

argues that the victim admitted that defendant failed to make penetration while attempting to engage in intercourse and that one of the counts relating to digital penetration was likewise unsupported by the evidence. He therefore concludes that the evidence supported only five, not seven, counts of rape.

When reviewing a claim relating to the sufficiency of the evidence to support a criminal conviction, we view the evidence most favorably to the prosecution and consider whether any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus; *State v. Thompkins* (1997), 78 Ohio St.3d 380, 390–391, 678 N.E.2d 541, 549 (Cook, J., concurring).

R.C. 2907.02(A)(2) prohibits any person from engaging in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force. R.C. 2907.01(A) defines "sexual conduct" as "vaginal intercourse between a male and female, and anal intercourse, fellatio, and cunnilingus between persons regardless of sex. Penetration, however slight, is sufficient to complete vaginal or anal intercourse."

The evidence, taken in a light most favorable to the state, showed that defendant completed two distinct acts of oral sex (a first time when he forced himself in the victim's mouth, a second when he ejaculated), made digital penetration "three or four times," and made penile penetration once. Contrary to defendant's argument, the victim testified that when defendant tried to reenter her she actually felt him "in the opening of my vagina." These add up to seven distinct acts of rape, the exact number charged by the indictment.

Defendant also claims that the victim's testimony that defendant completed "three or four" acts of digital penetration is too speculative to establish a basis for guilty verdicts on four acts. In *State v. Vines* (Sept. 14, 1989), Cuyahoga App. No. 55693, unreported, 1989 WL 107157, we considered an identical argument and stated, "The victim's inability to denote the exact number of times Vines performed these actions goes to the weight of the evidence not the sufficiency. See *State v. Harris* (June 3, 1982), Cuyahoga App. No. 44154, unreported [1982 WL 11297]; *State v. Richardson* (May 6, 1982), Cuyahoga App. No. 44081, unreported [1982 WL 5353]."

Our recent decision in *State v. Langston* (Feb. 12, 1998), Cuyahoga App. No. 71578, unreported, 1998 WL 57152, is not to the contrary. In *Langston,* the child victim of ten charged counts of rape could do no better than testify that he had been raped "a number of times" and that "it happened more than once." We conceded that these statements would be sufficient to support only two counts of rape, but by referring to three different time periods in which the victim had

been in Langston's company, we concluded that the evidence could support three guilty verdicts.

In this case, the victim's testimony that defendant digitally penetrated her "three or four" times was sufficient evidence that those acts could have occurred four, rather than three, times. Unlike *Langston*, where the child victim could only say that the rapes occurred "more than once," the victim's testimony in this case was sufficient to permit the jury to decide the precise number of times the rapes occurred. The second assignment of error is overruled.

## III

■ Defendant's third assignment of error complains that the court erred by refusing to find the kidnapping charge an allied offense to the rape charges. He argues that the kidnapping and rapes were allied offenses committed with similar import. The court refused to merge the offenses, finding a "separateness" between the kidnapping and the rape because defendant "captured" the victim and took her by force and violence from one part of the campus to another part of the campus.

■ Kidnapping and rape can be allied offenses of similar import and an offender may be punished for both offenses only if they are committed separately or with a separate animus as to each within the meaning of R.C. 2941.25(B). *State v. Price* (1979), 60 Ohio St.2d 136, 14 O.O.3d 379, 398 N.E.2d 772, paragraph five of the syllabus, approving and following *State v. Donald* (1979), 57 Ohio St.2d 73, 11 O.O.3d 242, 386 N.E.2d 1341.

In the syllabus to *State v. Logan* (1979), 60 Ohio St.2d 126, 14 O.O.3d 373, 397 N.E.2d 1345, the Ohio Supreme Court established guidelines to determine whether kidnapping and another offense are of the same or similar kind and committed with a separate animus:

"(a) Where the restraint or movement of the victim is merely incidental to a separate underlying crime, there exists no separate animus sufficient to sustain separate convictions; however, where the restraint is prolonged, the confinement is secretive, or the movement is substantial so as to demonstrate a significance independent of the other offense, there exists a separate animus as to each offense sufficient to support separate convictions;

"(b) Where the asportation or restraint of the victim subjects the victim to a substantial increase in risk of harm separate and apart from that involved in the underlying crime, there exists a separate animus as to each offense sufficient to support separate convictions."

The court correctly noted that defendant's restraint of the victim was so substantial both in terms of length and substance that it demonstrated a separate

animus. The victim said that defendant essentially stalked her, continually driving by her as she waited for a bus. While she attempted to find a safe place, defendant grabbed her, threatened to kill her, and "started dragging me across campus." He took her around the back of one of the buildings and tried to throw her down a flight of stairs.

In *State v. Alexander* (Feb. 25, 1993), Cuyahoga App. No. 61674, unreported, 1993 WL 51259, we considered a very similar fact pattern. Alexander grabbed his victim, threatened to kill her, and dragged her until she was confined in the corner of a courtyard before raping her. Citing *State v. Moore* (1983), 13 Ohio App.3d 226, 13 OBR 278, 468 N.E.2d 920, we found that Alexander's act of dragging the victim from an open place to a concealed place for cover during the rape constituted a separate animus for kidnapping and rape. See, also, *State v. Thomas* (Aug. 5, 1986), Franklin App. No. 85AP–414, unreported, 1986 WL 8670 (kidnapping victim from hallway and forcing her to walk to a locked restroom and performing rape in restroom stall constituted greater asportation than that required for rape).

The court did not err by finding that defendant's stalking, which ended with him dragging the victim across campus to a secluded stairwell, contained a separate animus from the rape offense. The third assignment of error is overruled.

## IV

The fourth assignment of error complains that defendant received ineffective assistance of trial counsel because counsel failed to do a multitude of things at trial.

To establish a claim of ineffective assistance of counsel, a defendant must first demonstrate that trial counsel's performance fell below the objective standard of reasonable competence under the circumstances. Second, a defendant must show that as a result of this deficiency, he was prejudiced at trial. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693; *State v. Mills* (1992), 62 Ohio St.3d 357, 370, 582 N.E.2d 972, 984–985. Even if counsel's performance could be deemed deficient for Sixth Amendment purposes, it must still be shown that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 697–698. A reasonable probability is "a probability sufficient to undermine confidence in the outcome" of the proceeding. *Id.; State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus.

We have considered each of the seven claimed instances of ineffective assistance of counsel and find only three that merit any discussion.

First, defendant claims that counsel should have asked the court to conduct an *in camera* hearing into the victim's past sexual history.

Defendant's argument shows a fundamental misunderstanding of the Rape Shield Law. R.C. 2907.02(D) states:

"Evidence of specific instances of the victim's sexual activity, opinion evidence of the victim's sexual activity, and reputation evidence of the victim's sexual activity shall not be admitted under this section unless it involves evidence of the origin of semen, pregnancy, or disease, or the victim's past sexual activity with the offender, and only to the extent that the court finds that the evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value."

In *State v. Gardner* (1979), 59 Ohio St.2d 14, 17–18, 13 O.O.3d 8, 10, 391 N.E.2d 337, 340, the Supreme Court stated:

"Several legitimate state interests are advanced by the shield law. First, by guarding the complainant's sexual privacy and protecting her from undue harassment, the law discourages the tendency in rape cases to try the victim rather than the defendant. In line with this, the law may encourage the reporting of rape, thus aiding crime prevention. Finally, by excluding evidence that is unduly inflammatory and prejudicial, while being only marginally probative, the statute is intended to aid in the truth-finding process."

Exceptions to the prohibition include evidence of the origin of semen, pregnancy, or disease, or evidence of the victim's past sexual activity *with the defendant.* R.C. 2907.02(D). Defendant did not challenge the origin of the semen; in fact, he admitted it was his. Nor did he claim a past sexual history with the victim. Lacking these two bases for submitting evidence of the victim's past sexual history, any request by counsel for a rape shield hearing would have been denied.

Second, defendant claims that counsel should have cross-examined the victim and her brother about her possible drug use in order to attack their credibility. Any questions about the brother's drug use would have been irrelevant, for there was no testimony about any possible drug use by him and no question concerning his cognitive abilities on the night of the offense. Given his minimal role, it remains obscure to us just what defendant hoped to prove by showing the brother's possible drug use on the night of the offenses.

There would have been marginal relevance to asking the victim if she used drugs, since defendant maintained that she said she was high, but counsel's decision to ask the question might have backfired, a point defendant concedes in

his supplemental brief. If, as defendant appears to concede, such a question *might* have created a backlash of sympathy for the victim, we fail to see how this matter of trial strategy can be the basis for a claim of ineffective assistance of counsel. See *State v. Carter* (1995), 72 Ohio St.3d 545, 558, 651 N.E.2d 965, 977.

■ Third, defendant complains that counsel failed to call character witnesses or fact witnesses in his defense. This argument really centers on counsel's failure to call defendant's cousin. It may be remembered that defendant initially told the police he had been drinking with his cousin and could not remember what happened because he had been drunk. When asked by the police to identify his cousin by name and address, defendant remained silent. At trial, defendant's story changed significantly. He admitted having sex with the victim, but claimed it had been consensual. He also denied being drunk at the time of the offense, claiming that he and his cousin had split a pint of alcohol earlier in the day, but that he had had nothing else to drink from 10:00 a.m. that morning until the time he encountered the victim. Moreover, defendant testified that at the time he met the victim he had been driving to a bar looking for a New Year's Eve party.

Just what defendant's cousin would have added to the story escapes us, for defendant admitted engaging in sexual conduct with the victim and the DNA evidence confirmed this fact. It would have been a dubious defense strategy for defendant to deny committing the offenses by saying he had been home drinking with his cousin at the time, when the state had conclusive physical proof to the contrary.

■ As a final matter, defendant cannot seriously argue that counsel performed deficiently because he failed to put on character witnesses to vouch for him. Defendant was caught trying to flee his house when approached by the police, and he lied to them by saying he had been with his cousin the previous evening. He admitted drinking on the day in question, although he later told the jury, "I don't drink or smoke." He claimed that being a husband and father of three should have counted for something, yet he admitted to the jury that the victim might have been propositioning him for sex and "I said I had money because that's what usually happens." Defendant was no Ozzie Nelson. Counsel did not perform deficiently by recognizing this fact. The fourth assignment of error is overruled.

*Judgment affirmed.*

MICHAEL J. CORRIGAN, J., concurs.

KARPINSKI, P.J., concurs in part and dissents in part.

MICHAEL J. CORRIGAN, Judge, concurring.

I concur wholeheartedly in the disposition of each of the four assignments of error, but I am compelled to expand upon the fourth assignment of error. Appellant's counsel argues that his client was denied the effective assistance of counsel. It is undisputed that any accused must be afforded zealous representation, but counsel is duty-bound to perform both ethically and professionally. To suggest that counsel is ineffective if they do not attempt to create a reasonable doubt where there might well not be one is improper. It is basic that there must exist a *good faith* basis for presenting a defense, placing a question, or proffering a theory of the case.

In the case *sub judice* to suggest that the victim was a drug addict out looking for sex is not only misguided it is unethical and unprofessional, and goes beyond decency. In their supplemental brief at page 13, appellant's counsel suggest that the victim of this brutal attack, Jennifer Sweeney, was "not the victim of a brutal kidnaping and rape, but was instead a probably-stoned [sic] young woman roaming the streets looking for drugs and settling for easy sex, then fabricating a rape out of shame and to protect her innocent-young-student image with her family."

This theory flies in the face of the overwhelming evidence presented by the state as well as the initial position of the defendant-appellant. Character assassination as suggested by appellant's counsel devoid of any basis whatsoever leaps well beyond the line of providing zealous representation. It is not the function of counsel to attempt to fabricate reasonable doubt. To embrace this approach is analogous to encouraging the subornation of perjury and the creation of theories of defense without any evidentiary support.

It is ofttimes suggested that there are three theories of each case: one for each adversary, and the truth. Although it is perhaps naive and optimistic to say so, there ought be but one truth. There must be a concerted effort to seek the truth on behalf of all of the participants in our system of jurisprudence. To proceed in an unethical manner on either side of a lawsuit and to adopt the attitude of *win at all costs* corrodes the very system that we embrace and undermines the fragile confidence that the citizenry has in our system.

To claim ineffective assistance of counsel by an unwarranted, uncorroborated, and baseless attempt to assassinate the character of the victim should result not only in a rejection of the assignment of error, but also in the imposition of sanctions. At bare minimum, the victim in this case is deserving of an apology for the unwarranted attempt to slander her good name.

KARPINSKI, Presiding Judge, concurring in part and dissenting in part.

I concur in the judgment of the majority, except that I respectfully dissent from its disposition of one part of the second assignment of error.

Defendant argues that there was insufficient evidence to convict him of four of the counts of rape when the victim testified that he committed "three or four" vaginal digital penetrations. As noted by the majority, a panel of this court, in an opinion authored by former Supreme Court Justice Holmes, recently vacated six counts of rape based on similarly indefinite testimony. *State v. Langston* (Feb. 12, 1998), Cuyahoga App. No. 71578, unreported, at 9–12, 1998 WL 57152.

This result is also consistent with *State v. Vines* (Sept. 14, 1989), Cuyahoga App. No. 55693, unreported, 1989 WL 107157, in which the defendant was convicted of three counts of rape based on testimony about one act of cunnilingus and two penetrations. Neither *State v. Harris* (June 3, 1982), Cuyahoga App. No. 44154, unreported, 1982 WL 11297, nor *State v. Richardson* (May 6, 1982), Cuyahoga App. No. 44081, unreported, 1982 WL 5353, supports the argument to the contrary. The grand theft conviction in *Harris* was supported by testimony either that defendant stole a refrigerator valued at more than $150 or that he stole additional items. The identification in *Richardson* was supported by testimony that the victim recognized defendant but was mistaken as to his name. The case at bar involves none of these considerations.

Despite the obvious ugliness of these crimes, it is not clear how a jury could find that a fourth offense was committed beyond a reasonable doubt, when the victim herself had doubt about whether the particular offense was committed more than three times. Accordingly, I concur in the judgment of the majority, except for its disposition of this claim. I would follow *Langston* and *Vines* and vacate the conviction on this particular fourth count of rape.