The STATE of Ohio, Appellee and Cross–Appellant,

v.

MYERS, Appellant and Cross–Appellee.

[Cite as *State v. Myers*, 153 Ohio App.3d 547, 2003-Ohio-4135.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 02AP–1187.

Decided Aug. 5, 2003.

Ron O'Brien, Franklin County Prosecuting Attorney, and Laura M. Rayce, Assistant Prosecuting Attorney, for appellee and cross-appellant.

Lisa M. Tome, for appellant and cross-appellee.

WATSON, Judge.

{¶ 1} Defendant-appellant (hereinafter "defendant") Andre S. Myers appeals from a judgment of the Franklin County Court of Common Pleas finding him guilty of kidnapping with specification in violation of R.C. 2905.01, two counts of

rape in violation of R.C. 2907.02, and aggravated burglary in violation of R.C. 2911.11. For the following reasons, we affirm the judgment of the trial court but remand with instructions.

{¶ 2} At approximately 5:55 a.m., on March 3, 2000, Ellen Glor awoke to her telephone ringing at her residence at 4498 Kenfield Road, Columbus, Ohio. Glor answered the phone. However, when she put the receiver to her ear, all she heard was a dial tone. Thinking it was a wrong number, Glor hung up the telephone and started her daily activities.

{¶ 3} After feeding her cat and making coffee, Glor took a shower. While Glor was shampooing her hair and had shampoo in her eyes, she heard the sliding door of the shower open and felt a hand go over her eyes. Defendant turned off the water and said, "Don't scream or I'll hurt you." Defendant instructed Glor to get out of the shower and walk straight ahead into her bedroom.

{¶ 4} When Glor reached the edge of her bed, defendant commanded that she "lay [sic] down, face down, keep [her] eyes closed, put [her] butt up in the air and spread [her] legs." Defendant proceeded to digitally penetrate Glor's anus. He then ordered her to turn over and continue to keep her eyes closed. Glor turned over onto her back and intentionally opened her eyes. Upon doing so, Glor was shocked to see that defendant was an attractive man.

{¶ 5} When Glor opened her eyes, defendant was approximately an arm's length away from her on her left side. Although Glor is nearsighted and was not wearing her eyeglasses, the lights in her bedroom were on during the attack.

{¶ 6} While Glor was on her back, defendant digitally penetrated her vagina. After defendant finished, he stood up, told Glor, "Don't move," and left her bedroom. Glor watched defendant as he left her bedroom. She observed defendant wearing a light gray, rounded knit cap with a three-inch roll, a darker gray jacket with a zipper down the front, and skin tight, black, shiny pants.

{¶ 7} Glor stayed on the bed until she heard the door shut to the outside of the house. She then contacted the police station near her house. Columbus police responded to the scene. Glor declined a trip to the hospital.

{¶ 8} Detective Eric Wooten of the Sexual Abuse Squad responded to Glor's residence shortly after she phoned the police station. At that time, Glor provided Detective Wooten with a description of her attacker. She described a black male between 24 and 35 years of age with a mustache. She estimated his weight at 180 pounds and his height at six feet to six feet one inch. Glor's entire contact with defendant lasted two to three minutes. Additionally, Glor informed Detective Wooten of the hang-up telephone call she received shortly before the attack. Finally, she told Detective Wooten of seeing an individual in dark clothes in her

backyard several days before the attack. As the person left when she told him to, she did not contact the police.

{¶ 9} Based upon Glor's information regarding the hang-up telephone call, Detective Wooten obtained a subpoena for the telephone records of the incoming and outgoing calls from her telephone number from February 21, 2000, to March 4, 2002. Based upon a review of the telephone records received from Ameritech, Detective Wooten determined that the hang-up telephone call originated from defendant's residence, 4363 Kenfield Road, Columbus, Ohio.

{¶ 10} Additionally, Detective Wooten obtained a photograph of defendant from his employer to place in a photograph array to show Glor. The photograph was placed in random order in a black and white photograph array with five other photographs that had similar facial characteristics. Detective Wooten put the photograph array together and conducted it in accordance with his training.

{¶ 11} Detective Wooten showed the photograph array to Glor on April 14, 2000. In showing the photograph array to Glor, Detective Wooten did not suggest to Glor that her attacker was included in the photograph array and did not suggest to Glor that she should pick a particular photograph. Both Detective Wooten and Glor testified that she was unable to identify any of the individuals from the photograph array as her attacker. When Glor was unable to identify her attacker, Detective Wooten took back the photograph array from her and did not tell Glor whether or not the suspect was in the photograph array.

{¶ 12} In the course of the investigation, Detective Wooten requested surveillance of defendant by the Special Investigative Unit ("SIU") and S.W.A.T. Sergeant Michael Robinson and Detective Don Sowards of SIU both observed defendant on April 13 and 14, 2000. At the time, Sergeant Robinson and Detective Sowards were in unmarked vehicles with darkened windows.

{¶ 13} On April 13, 2000, at approximately 3:54 a.m., Sergeant Robinson observed defendant exit his residence wearing a green coat, knit cap, gloves, and dark pants, and began jogging westbound on Stanley. Defendant then cut south through the yards east of Danforth. At approximately 5:59 a.m., Detective Sowards observed a black male dressed in dark clothing, dark knit cap, and gloves enter the rear of defendant's residence.

{¶ 14} On April 14, 2000, at approximately 3:54 a.m., Detective Sowards watched defendant, wearing a green coat, knit cap, gloves, and dark pants, exit the rear of his residence and begin jogging westbound on Stanley and cut southbound through the yards on Stanley. Shortly after 5:00 a.m., Sergeant Robinson saw defendant go up into the yard of a house, get next to the house, and hide in the bushes. Around the same time, Detective Sowards observed defendant look inside the windshield of his vehicle. Defendant proceeded to place

his hands on the vehicle and walk completely around the vehicle. He then proceeded to walk westbound and enter his residence.

{¶ 15} After conversations with the surveillance team, Detective Wooten testified to obtaining a search warrant for defendant's residence. Detective David McKee testified at trial regarding the execution of the search warrant at the defendant's residence. Recovered from the basement of defendant's residence were a knit cap, jacket, and pants.

{¶ 16} Additionally, Detective Wooten testified to obtaining a search warrant for a more recent photograph of defendant. The photograph obtained from the search differed from the photograph obtained from defendant's employer. In the first photograph, defendant had hair and no mustache. In the second photograph, defendant's head was shaved and he had a mustache. Detective Wooten proceeded to compile a second photograph array with the new photograph. Again, the photograph was placed in random order in a black and white photograph array with five other photographs which had similar facial characteristics. Detective Wooten, again, put the photograph array together and conducted it in accordance with his training.

{¶ 17} On April 20, 2000, Detective Wooten showed Glor the second photograph array. Detective Wooten did not suggest to Glor that she pick a particular photograph. After viewing the second photograph array, Glor identified defendant as her attacker by circling the photograph number and signing her name next to the photograph selected. Defendant's photograph was located in the number five position in the second array and the number four position in the first array.

{¶ 18} After Glor identified defendant, Detective Wooten completed a photograph array procedure form. Glor wrote on the array form "Picture # 5 looks closely like the man who entered my house on March 3 and sexually assaulted me. The resemblance is a 7 out of 10 from my memory picture."

{¶ 19} On April 28, 2000, defendant was indicted by the Franklin County Grand Jury for one count of kidnapping with a sexual motivation specification ("Count One"), one count of rape with a sexually violent predator specification ("Count Two"), one count of rape without a specification ("Count Three"), one count of aggravated burglary ("Count Four"), and three counts of burglary (hereinafter "burglary counts"). Subsequently, the state dismissed the burglary counts.

{¶ 20} A jury trial resulted in a verdict finding defendant guilty of Counts One through Four. However, defendant waived his right to a jury as to the sexually violent predator specification. By judgment entry filed October 23, 2002, the trial court sentenced defendant to seven years for Count One, eight years for Count Two, eight years for Count Three, and seven years for Count Four. The trial

court merged the sentence in Count One with Counts Two and Three, and ran the sentence in Count One concurrently with Count Four. The trial court imposed consecutive sentences in Counts Two, Three, and Four, for a total of 23 years. Finally, the trial court dismissed the sexually violent predator specification in Count Two as being unconstitutional.

{¶ 21} Defendant timely appeals and asserts four assignments of error:

{¶ 22} "1. The trial court erred by denying [defendant's] Motion to Suppress Identification as the Identification process was inherently unreliable and tainted by improper law enforcement procedures, thereby denying [defendant] his right to due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution and comparable provisions of the Ohio Constitution."

{¶ 23} "2. The trial court erred by allowing into evidence inadmissible hearsay in the form of telephone records thereby depriving [defendant] of his right of confrontation and due process of law as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and comparable provisions of the Ohio Constitution."

{¶ 24} "3. The trial court erred in denying [defendant's] Motion in Limine under Evid.R. 404(B) as the introduction of other acts evidence deprived [defendant] of a fair trial and due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution and comparable provisions of the Ohio Constitution."

{¶ 25} "4. The trial court abused its discretion in imposing lengthy, consecutive sentences, thereby depriving [defendant] of due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution and comparable provisions of the Ohio Constitution."

{¶ 26} Plaintiff-appellee also appeals from the trial court's judgment and has filed one assignment of error:

{¶ 27} "1. The trial court erred in determining that R.C. 2971.01(H)(2)(f) is unconstitutional."

{¶ 28} Defendant's first assignment of error asserts that the trial court erred when it failed to suppress Glor's out-of-court identification of defendant as her attacker.

{¶ 29} An appellate court reviews a trial court's ruling on a motion to suppress de novo. *State v. Russell* (1998), 127 Ohio App.3d 414, 416, 713 N.E.2d 56, citing *Ornelas v. United States* (1996), 517 U.S. 690, 698–699, 116 S.Ct. 1657, 134 L.Ed.2d 911. However, "[i]n a hearing on a motion to suppress evidence, the trial court assumes the role of trier of fact and is in the best position to resolve questions of facts and evaluate the credibility of witnesses." *State v. Hopfer*

(1996), 112 Ohio App.3d 521, 548, 679 N.E.2d 321, quoting *State v. Venham* (1994), 96 Ohio App.3d 649, 653, 645 N.E.2d 831. Accordingly, an appellate court reviews findings of fact only for clear error, giving due deference to the trial court with respect to the inferences drawn from the facts. *State v. Bing* (1999), 134 Ohio App.3d 444, 448, 731 N.E.2d 266, citing *Ornelas,* supra, 517 U.S. at 699, 116 S.Ct. 1657, 134 L.Ed.2d 911. Thus, accepting those facts as true, an appellate court independently determines, as a matter of law and without deference to the trial court's conclusion, whether the trial court met the applicable legal standard. *State v. Guysinger* (1993), 86 Ohio App.3d 592, 594, 621 N.E.2d 726.

{¶ 30} Unreliable identification testimony is excludable under the Due Process Clause of the United States Constitution. *State v. Salwan* (May 30, 1996), Cuyahoga App. No. 68713, 1996 WL 284857. In the context of eyewitness identification testimony, an impermissibly suggestive identification procedure will be suppressed due to the substantial likelihood of irreparable misidentification. *Neil v. Biggers* (1972), 409 U.S. 188, 198, 93 S.Ct. 375, 34 L.Ed.2d 401. "It is the likelihood of misidentification which violates a defendant's right to due process." As such, the critical inquiry is "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." Id. at 199, 93 S.Ct. 375, 34 L.Ed.2d 401. "[R]eliability is the linchpin in determining the admissibility of identification testimony." *Manson v. Brathwaite* (1977), 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140. The factors to consider in determining whether identification testimony is reliable include (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description of the criminal, (4) the level of certainty demonstrated at the confrontation, and (5) the time between the crime and the confrontation. *Biggers,* 409 U.S. at 199–200, 93 S.Ct. 375, 34 L.Ed.2d 401. The corrupting effect of any suggestive identification procedure must then be weighed against these factors. *Manson,* 432 U.S. at 114–116, 97 S.Ct. 2243, 53 L.Ed.2d 140.

{¶ 31} Upon examination of the testimony of Detective Wooten and the first and second photograph arrays, we conclude that the current identification procedure was not impermissibly suggestive. A suggestion made to an identifying witness that the police have reason to believe that one of the persons in the array committed the crime is a relevant factor in the suggestivity analysis, *State v. Strodes* (Apr. 17, 1998), Clark App. No. 2475, at 7, 1998 WL 177533, citing *State v. Hafner* (1975), 168 Conn. 230, 238, 362 A.2d 925, certiorari denied (1975), 423 U.S. 851, 96 S.Ct. 95, 46 L.Ed.2d 74, as the witness has an additional incentive and impetus to identify one of the pictures. *Strodes* at 7. However, neither Detective Wooten nor any other police officer told Glor that the individual whom

the police believed was her attacker was in either the first or second photograph array. With respect to the first photograph array, Detective Wooten testified:

{¶ 32} "Q. At any time during [Glor's] viewing of this photo array, did you or anyone else suggest to [Glor] that her attacker was included in those photos?

{¶ 33} "A. No, we did not.

{¶ 34} "Q. At any time did anyone suggest to [Glor] that she select a particular photo?

{¶ 35} "A. No."

{¶ 36} Similarly, with respect to the second photograph array, Detective Wooten stated:

{¶ 37} "Q. At any time during [Glor's] viewing of this photo array, did you or anyone else suggest to [Glor] to pick a particular photo?

{¶ 38} "A. No."

{¶ 39} Moreover, it is believed that "[w]hen the suspects are the only individuals to appear in a subsequent photo array, the effect is to trigger a recognition response in the witness." Id., citing Taylor, Eyewitness Identification (1982), at 116. However, the possibility that the viewing of the first photograph array triggered Glor's recognition of defendant in the second photograph array is remote. There is little resemblance between the photographs in the first and second photograph array. To recognize any similarity in facial structure requires extensive review and comparison. Moreover, in the first photograph, defendant has hair and is clean-shaven. In the second photograph, his head is shaved and he has a mustache. As such, we cannot conclude that a recognition response was triggered in Glor when she viewed the second photograph one week after viewing the first photograph.

{¶ 40} Should the current identification procedure be determined impermissibly suggestive, an application of the *Biggers* factors to Glor's out-of-court identification of defendant results in the conclusion that the identification was sufficiently reliable and that the trial court did not err in admitting the identification. First, while Glor did not have her eyeglasses on, she is nearsighted and her attacker was an arm's length away from her. Additionally, during the time Glor viewed her attacker, the bedroom lights were on. Finally, Glor testified that she got a good look at her attacker.

{¶ 41} Second, Glor had a high degree of attention. As in *Biggers*, Glor "faced him directly and intimately. She was no casual observer, but rather the victim of one of the most personally humiliating of all crimes." *Biggers*, 409 U.S. at 200, 93 S.Ct. 375, 34 L.Ed.2d 401. She specifically opened her eyes, contrary to her attacker's instruction, to see what was happening. "There came to be a time

when he wasn't touching me any more and I couldn't stand the suspense of it, even though he said, 'don't open your eyes or else I'll hurt you,' I couldn't stand not knowing what was going on. So I opened up my eyes." This is also supported by the fact that she commented on the fact that her attacker was attractive, "I was so shocked that I said, 'Oh, my, you're a good-looking man. * * * Why don't you get your own girlfriend?' "

{¶ 42} Third, Glor described her attacker to Detective Wooten shortly after the incident. She included his race, approximate height, weight, age range, and a description of his clothing. Defendant did not assert that he does not possess the physical characteristics described by Glor. See *Manson,* 432 U.S. at 115, 97 S.Ct. 2243, 53 L.Ed.2d 140.

{¶ 43} Fourth, upon identifying defendant from the second photograph array, she rated her level of certainty a seven out of a ten. At trial, Glor expounded upon her level of certainty: "I was certain it was the individual; however, I did not know what kind of hairstyle my attacker had at the time. He was wearing a hat. So I said this picture is a seven out of a ten resemblance of what I remember." Additionally, Glor testified at trial that she was absolutely certain that the man she picked from the second photograph array was her attacker:

{¶ 44} "Q. Now, are you absolutely certain that the man you identified in the second set of photos is the man that raped you?

{¶ 45} "A. Yes, I am.

{¶ 46} "Q. And how certain are you that the man sitting in this courtroom that you've already identified is the man that raped you?

{¶ 47} "A. 100 percent."

{¶ 48} Finally, the length of time between the attack and Glor's identification was six weeks. While six weeks is a significant period of time, it is offset by Glor's failure to identify her attacker from the first photograph array. Her failure to identify an individual in the first array indicates that she was not vulnerable to whatever suggestiveness may have been inherent in the photo array, thus bolstering her reliability. See *Biggers,* 409 U.S. at 412, 93 S.Ct. 375, 34 L.Ed.2d 401.

{¶ 49} Accordingly, applying the *Biggers* factors, we cannot conclude that, under all of the circumstances, there is substantial likelihood of irreparable misidentification. Defendant's first assignment of error is overruled.

{¶ 50} Defendant's second assignment of error asserts that the trial court erred when it allowed into evidence the Ameritech telephone records.

{¶ 51} As a foundation for the admission of the telephone records, the state offered testimony from Victoria Kiser, a retired manager in the corporate

security asset protection office. At the time of trial, she was under contract with Ameritech for the purpose of testifying for subpoenas and any other work related to the corporate security office. Additionally, at the time the telephone records at issue were retrieved, Kiser had not yet retired from Ameritech.

{¶ 52} Kiser was familiar with the manner in which Ameritech keeps its records. She stated that "[w]hen a call is made, the information, such as the date of the call, the originating and terminating numbers, the information is captured in a switch in one of our central offices." The switch is a server which collects information.

{¶ 53} Ameritech does not keep paper records of incoming and outgoing calls in the normal course of business. However, Ameritech retains the information in the switch in the regular course of business for 60 days. A paper copy of a particular call or calls can be made in response to a subpoena or court order. Kiser testified regarding Ameritech's procedure for responding to court orders regarding the production of phone records. "When we receive a court order, then we go into the switch. It is an automated system. You go in and type into the computer. You put in the requested information such as the date and times and the terminating or originating numbers that you have. And a report is created. The information is extracted and a report is created."

{¶ 54} Ameritech received a court order with respect to incoming and outgoing calls from Glor's phone number from February 21, 2000, to March 4, 2000. Ameritech produced the requested records. Kiser identified the records as Ameritech records which, with the exception of yellow highlighting, did not appear to be altered. As to a particular telephone call in the records, Kiser testified that "[t]he call took place on March the 3rd, 2000. The call originated from telephone No. (614) 263–2990. The call terminated at (614) 447–9259. The call was placed at 05:55:13 seconds a.m. And the duration of the call was 13.2 seconds." Additionally, the subscriber information for (614) 263–2990 was defendant's residence.

{¶ 55} Upon cross-examination, Kiser acknowledged that she did not personally prepare the records and stated, "I think they come out of Michigan." While Kiser has been to the Michigan facility, she acknowledged that she had not been there in four years and was not present when the records were prepared. Additionally, she did not know who prepared the records. However, with respect to the accuracy of the records at issue, Kiser stated, "It is possible that there is a call that was made that did not appear on here. As far as the calls that are on here, yes, sir, they are 100 percent accurate." Kiser reiterated this point, stating, "I have seen calls be omitted from this, calls that would not show up. But I have never seen a call within the system not show up."

{¶ 56} Evid.R. 803(6) addresses the admissibility of business records as an exception to the general hearsay rule:

{¶ 57} "Records of regularly conducted activity. A memorandum, report, record, or data compilation, in any form, of acts, events, or conditions, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness or as provided by Rule 901(B)(10), unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term 'business' as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit."

{¶ 58} Whether to admit a business record into evidence pursuant to Evid.R. 803(6) is a decision within the sound discretion of the trial court, which will not be disturbed on appeal unless an abuse of discretion can be shown. *WUPW TV–36 v. Direct Results Marketing, Inc.* (1990), 70 Ohio App.3d 710, 714, 591 N.E.2d 1345. The trial court abuses its discretion when it admits business records when an inadequate foundation was laid to establish their admissibility pursuant to Evid.R. 803(6). *State v. Comstock* (Aug. 29, 1997), Ashtabula App. No. 96–A–0058, 1997 WL 531304.

{¶ 59} The Ohio Supreme Court held that the business record exception "is based on the assumption that the records, made in the regular course of business by those who have a competent knowledge of the facts recorded and a self-interest to be served through the accuracy of the entries made and kept with knowledge that they will be relied upon in a systematic conduct of such business, are accurate and trustworthy." *Weis v. Weis* (1947), 147 Ohio St. 416, 425–426, 34 O.O. 350, 72 N.E.2d 245. In laying a foundation, "the testifying witness must possess a working knowledge of the specific record-keeping system that produced the document." *State v. Davis* (1991), 62 Ohio St.3d 326, 342, 581 N.E.2d 1362.

{¶ 60} Evid.R. 803(6) does not require the witness whose testimony establishes the foundation for a business record to have personal knowledge of the exact circumstances of preparation and production of the document. Notwithstanding, the witness must "demonstrate that he or she is sufficiently familiar with the operation of the business and with the circumstances of the preparation, maintenance, and retrieval of the record in order to reasonably testify on the basis of this knowledge that the record is what it purports to be, and was made in the ordinary course of business." *Keeva J. Kekst Architects,*

*Inc. v. George Dev. Group* (May 15, 1997), Cuyahoga App. No. 70835, at 12–13, 1997 WL 253171, citing *WUPW TV–36.*

{¶ 61} We find Kiser's testimony to be sufficient to authenticate the Ameritech telephone records for admission into evidence pursuant to Evid.R. 803(6).

{¶ 62} Kiser demonstrated sufficient familiarity with the operation of Ameritech's business and the circumstances under which the telephone records were prepared, maintained, and retrieved. She testified as to how information regarding a telephone call is captured by the switch, a computer server. Kiser's testimony detailed how the computerized records of telephone calls are maintained in the normal course of business, which can be reduced to paper records if requested by court order or subpoena. Further, she testified regarding the procedure employed to prepare a written report of a telephone call. Kiser's knowledge was sufficient to base her testimony that the telephone records at issue were what they purported to be and were made in the ordinary course of business. Therefore, defendant's second assignment of error is overruled.

{¶ 63} Defendant's third assignment of error asserts that the trial court erred in permitting the introduction of other-acts evidence pursuant to Evid.R. 404(B).

{¶ 64} The trial court is vested with discretion in determining the admissibility of evidence. Evid.R. 104. Any error in the admission of evidence must be analyzed under an abuse-of-discretion standard of review. "The term 'abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *State v. Roden* (June 12, 2000), Stark App. No. 1999CA00275, 2000 WL 874211, citing *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 16 O.O.3d 169, 404 N.E.2d 144.

{¶ 65} Generally, evidence of a defendant's prior conduct tending to show bad character is not admissible to prove conduct at issue during trial. However, a common–law exception to the rule is codified in Evid.R. 404(B), which states:

{¶ 66} "Other crimes, wrongs or acts.

{¶ 67} "Evidence of the other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

{¶ 68} As Evid.R. 404(B) codifies a common-law exception, it must be construed against admissibility, and the standard for determining admissibility is strict. *State v. Broom* (1988), 40 Ohio St.3d 277, 281–282, 533 N.E.2d 682, citing *State v. Burson* (1974), 38 Ohio St.2d 157, 158–159, 67 O.O.2d 174, 311 N.E.2d

526; *State v. DeMarco* (1987), 31 Ohio St.3d 191, 194, 31 OBR 390, 509 N.E.2d 1256. Evid.R. 404(B) does not contain the word "like" or "similar." Evid. R. 404(B) contemplates acts which may or may not be similar to the crime at issue. If the other act does "tend to show" by substantial proof any of the enumerated reasons, the other-act evidence may be admissible. Id., citing *State v. Flonnory* (1972), 31 Ohio St.2d 124, 60 O.O.2d 95, 285 N.E.2d 726.

{¶ 69} At trial, the state argued that the other-acts evidence tended to show a plan. " 'Scheme, plan, or system evidence is relevant where it tends to prove the offender's identity or where * * * the 'other acts' form part of the immediate background of the alleged act which forms the foundation of the crime charged in the indictment. * * * To be admissible pursuant to this subcategory of 'scheme, plan, or system' evidence, the 'other acts' testimony must concern events which are inextricably related to the alleged criminal act.' " *State v. Hutton* (1990), 53 Ohio St.3d 36, 39–40, 559 N.E.2d 432, citing *State v. Curry* (1975), 43 Ohio St.2d 66, 73, 72 O.O.2d 37, 330 N.E.2d 720.

{¶ 70} In the case before us, we find no error in the admission of the other-acts evidence. The other-acts evidence tended to show plan and identity. Defendant was observed leaving his residence at approximately 3:54 a.m., and returning at approximately 5:59 a.m. Glor received the hang-up telephone call at approximately 5:55 a.m., and was attacked shortly thereafter. Additionally, defendant was wearing clothing identical to the clothing described by Glor to Detective Wooten. Finally, defendant was observed hiding in the bushes of residential homes in his neighborhood. Glor's attacker broke into her home, which is in defendant's neighborhood, to commit the assault.

{¶ 71} Defendant argues further that, even if the other-acts evidence was admissible under Evid.R. 404(B), it may still be excluded pursuant to Evid.R. 403 if its probative value is outweighed by its prejudicial effect. Again, we find no error in the admission of the other-acts evidence. The testimony regarding defendant's early morning behavior and the clothing he was wearing was probative of defendant's identity and plan. Moreover, the probative value outweighed the prejudicial effect to defendant. Accordingly, defendant's third assignment of error is overruled.

{¶ 72} Defendant's fourth assignment of error contends that the trial court abused its discretion in imposing lengthy consecutive sentences in violation of R.C. 2929.14(E).

{¶ 73} R.C. 2929.14(E)(4) states:

{¶ 74} "If multiple prison terms are imposed on an offender for convictions· of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect

the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:

{¶ 75} "(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

{¶ 76} "(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

{¶ 77} "(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender."

{¶ 78} Additionally, R.C. 2929.19(B)(2)(c) establishes the procedure the trial court must follow when imposing consecutive sentences on a defendant. Moreover, it mandates that the trial court make a finding that sets forth the reasons for imposing consecutive sentences. *State v. Hurst* (Nov. 8, 2001), Franklin App. No. 01AP–77, 2001 WL 1381216.

{¶ 79} However, the trial court is not required "to utter any magic or talismanic words, but it must be clear from the record that the court made the required findings." *State v. White* (1999), 135 Ohio App.3d 481, 486, 734 N.E.2d 848; *State v. Quinn* (1999), 134 Ohio App.3d 459, 731 N.E.2d 276 (the trial court substantially complied with the statute when it provided sufficient findings on the record); *State v. Finch* (1998), 131 Ohio App.3d 571, 723 N.E.2d 147 (the trial court must make a finding on the record that it has considered the applicable statutory criteria before imposing consecutive sentences).

{¶ 80} To determine whether the trial court made the required statutory findings and explanations, we review the record of the October 17, 2002 sentencing hearing and the October 23, 2002 sentencing entry. Prior to sentencing, the trial court held a sexual offender classification hearing as required by R.C. 2950.09(B). The trial court determined that defendant was a sexual predator. In making that determination, the trial court discussed the circumstances of this offense, stating:

{¶ 81} "There was this problem that existed, I believe, in 1986 where [defendant] realized and recognized that he had a problem. And for whatever reason he did not deal with it in any degree of effectiveness at all. There was a certain

definite plan and premeditation to this particular offense. The victim indicated that she saw this—a man similar to [defendant], dressed similar to [defendant] sometime shortly before the offense took place. There were other reports of a stalking-type of an individual that also fit that description * * *."

{¶ 82} Additionally, the trial court stated:

{¶ 83} "There is one thing I failed to mention earlier when we were going over the specification and also the classification process that I think is very significant here * * * [a]nd that is * * * the comment * * * made by [defendant] to [Glor] * * * which was to the extent that when asked a question about why he was doing this his response was I don't like women and it was said in a very adamant fashion."

{¶ 84} Furthermore, when focusing on the issue of defendant's sentence, the trial court stated:

{¶ 85} "* * * [B]ecause Ms. Glor is composed, is self-reliant and has the strength of character that she has and has come through this the way she has come through it, it makes it easy to forget just how terrible this whole thing was. But when you just stand back and disassociate yourself from her presence * * * and look at the facts, what was done and the way it was done and where it was done, this is a very, very serious offense * * * there's plenty of evil left in this act * * *.

{¶ 86} "* * * [T]he Court finds that the shortest period of incarceration would first [demean] the seriousness of this offense and would not adequately protect the public from future crimes by [defendant].

{¶ 87} "The Court further finds that the harm caused by [defendant's] conduct and I consider them to be multiple offenses * * * was so great and unusual that no single prison term for any of the offenses committed is a part of single course of conduct adequately reflects the seriousness of the offender's conduct.

{¶ 88} "The Court further determines for the reasons that have already been put on this record, the offender's conduct demonstrates that consecutive sentences are necessary to protect the public from future crime. * * *"

{¶ 89} Here, the record clearly indicates that the trial court found that imposing the shortest prison term would not adequately reflect the seriousness of defendant's conduct and protect the public. Moreover, the trial court plainly stated that consecutive sentences were necessary to protect the public from future crime. While the trial court did not specifically restate the "magic" language of R.C. 2929.14(E)(4) with respect either to disproportionality or danger to the public in regard to the consecutive sentences, the trial court's statements

during sentencing clearly support the fact that the trial court considered these matters and made the required findings.

{¶ 90} Moreover, the trial court complied with the standards set forth in R.C. 2929.19(B)(2)(c). The trial court, during the sexual predator offender classification hearing, noted that defendant was aware of his problem but did not effectively deal with it. Moreover, in describing the offense, the trial court stated that he acted with a definite plan and premeditation in committing the offense. Finally, the trial court concluded that the offense had "plenty of evil" in it. While these statements were made during the sexual predator offender classification hearing, immediately preceding the sentencing hearing, the trial court explicitly stated, when discussing consecutive sentences, "for the reasons that have already been put on this record." We do not believe that a trial court, to comply with R.C. 2929.19(B)(2)(c), must restate findings that were stated moments earlier. To impose such a requirement is unduly burdensome and does not further the principles of R.C. 2929.19(B)(2)(c). As such, the record reflects the trial court's reasoning for finding, as it did, the harm caused by the multiple offenses was so great and unusual that a single sentence did not adequately reflect the seriousness of the offender's conduct.

{¶ 91} Accordingly, the record clearly establishes that the trial court made the required statutory factual findings, pursuant to R.C. 2929.14(E)(4) and, further, complied with the standards set forth in R.C. 2929.19(B)(2)(c). Therefore, we cannot say that the record failed to support the trial court's findings and, therefore, this court will not modify defendant's sentence. See R.C. 2953.08(G). Consequently, defendant's fourth assignment of error is overruled.

{¶ 92} Plaintiff argues in its cross-assignment of error that the trial court erred in determining that R.C. 2971.01(H)(2)(f) is unconstitutional. Due to our inability to discern the trial court's reasoning for its decision, we are unable to resolve the substantive issue presented by plaintiff in its cross-assignment of error. Accordingly, plaintiff's cross-assignment of error is sustained to the extent that the trial court's judgment requires further explanation and clarification of its supporting reasons.

{¶ 93} Therefore, defendant's four assignments of error are overruled and the judgment of the trial court is affirmed. However, plaintiff's cross-assignment of error is sustained. This cause is remanded with instructions to the trial court for further proceedings in accordance with law consistent with this opinion.

Judgment affirmed
and cause remanded
with instructions.

BROWN and LAZARUS, JJ., concur.