**UNITED STATES of America ex rel. Rogelio Nieves NEGRON, Petitioner,**

v.

**The STATE OF NEW YORK, Respondent.**

**No. 69–C–757.**

United States District Court, E. D. New York.

March 26, 1970.

Milton Adler, New York City, for petitioner; Edward J. Kelly, New York City, of counsel.

Louis J. Lefkowitz, Atty. Gen. of State of New York, for respondent; Hillel Hoffman, Asst. Atty. Gen., of counsel.

BARTELS, District Judge.

On March 10, 1967, Rogelio Nieves Negron was sentenced in the County Court, Suffolk County, to a term of twenty years to life after a jury verdict finding him guilty of murder in the second degree, which judgment was affirmed, without opinion, by the Appellate Division, Second Department, on April 27, 1968, People v. Negron, 29 A.D.2d 1050, 290 N.Y.S.2d 871. Leave to appeal to the New York Court of Appeals was denied on July 12, 1968, and certiorari to the United States Supreme Court was also denied on June 2, 1969, Negron v. New York, 395 U.S. 936, 89 S.Ct. 2000, 23 L. Ed.2d 452. In this posture of the case Negron files a *pro se* application for a writ of *habeas corpus*. The issue to be decided is whether there was an obligation upon the State court to advise Negron that, if he so desired, he was entitled to a court-appointed interpreter to translate the testimony of the English-speaking witnesses either for or against him, and whether the failure to so advise Negron and to appoint such an interpreter deprived him of his constitutional rights under the Sixth and Fourteenth Amendments.

Testimony at the Trial

Negron recently emigrated to the United States from Puerto Rico and had been in this country only a few months when he was arrested for murder. At the time of his arrest he was approximately twenty-three years old, indigent, and possessed only a sixth grade education. He neither spoke nor understood English, a handicap which he apparently retains to this day. At the time of the crime he was employed as a potato packer for the A & P Company at a farm in Riverhead, New York and lived in a small house with three co-workers, one of whom was Angel Luis Pagan and another was the victim, Juan DelValle. From the record it appears that Negron had a wife and family in Puerto Rico, to whom he regularly sent $15 or $20 a week from his modest salary.

At 5 P.M. on the day of the murder Negron started to cook the evening meal for the group. Prior to that time he and DelValle had been drinking and DelValle was drunk but Negron was not "very drunk." Between 6 and 6:30 P.M. an argument took place between DelValle and Negron in the presence of Pagan, which deteriorated to one of obscene name-calling and finally resulted in DelValle calling Negron a "cabron", meaning "cuckold." Negron resented this and told DelValle not to call him that again. DelValle rose, and pushed Negron, saying "I'll fight you any way you want." According to Pagan, Negron then proceeded to the kitchen, obtained a knife, and returned to DelValle and, putting the knife to DelValle's throat, said to him, "Call me cabron again, call me that again." At this moment Pagan saw nothing in DelValle's hands and said to Negron, "Don't do that." Pagan ran out to call Maximino Figueroa, a shop steward

at the packing house, and when Pagan returned he said he saw Negron come out of the kitchen with the same knife he had held to DelValle's throat and that now the knife was bloody. As Negron came out of the house, according to Pagan, he said "He is dead, I killed him." Pagan and Figueroa entered the house and saw DelValle on the floor, face up, in agony and surrounded by blood. There was nothing in DelValle's hands.

Detective Carlos Garcia testified that he arrived at the scene approximately one-half hour later, warned Negron of his rights and took him to the offices of the Seventh Police Squad, where Negron told Garcia that DelValle and he had been drinking, that DelValle called Negron a "cabron"; that Negron became angry, that DelValle pulled a knife and that a scuffle ensued during which DelValle was stabbed.

Both at the *Huntley* hearing held prior to the trial and at the trial, police investigator Joseph Gallardo testified to several inculpatory admissions made by Negron at the station house. Negron at all times denied making these or any other inculpatory admissions. He took the stand in his own defense, asserting that it was DelValle who had the knife, that Negron became so startled that instead of retreating, went forward and a scuffle resulted, that all of a sudden DelValle grabbed his stomach and then Negron noticed the knife on the floor, picked it up and ran out. Only two of the State's fourteen witnesses, Pagan and Maxamino Diaz, testified in Spanish and their testimony was translated by an offical court interpreter, Mrs. Elizabeth Maggipinto. The remaining twelve prosecution witnesses testified in English. Thus, as far as Negron was concerned, the bulk of the testimony of the witnesses against him was unintelligible and his attorney so stated in his summation.

Prior to the selection of the jury the State court informed Negron's attorney that the court understood that the statutory "admonition" respecting challenges to the jurors would have to be communicated to Negron through an interpreter. Accordingly, the court appointed Mrs. Maggipinto "for this purpose." As the trial progressed, however, the interpreter was employed only when Spanish-speaking witnesses were testifying. Thus, she rendered a simultaneous translation of the testimony of Pagan, Diaz and Negron for the benefit of the court, the lawyers, and the jury. At no time, however, did Mrs. Maggipinto translate simultaneously or by summary the testimony of the English-speaking witnesses for the benefit of Negron, nor did the court direct her so to do. In other words, it was a one-way street.

### Testimony before this Court

Negron, being indigent, was represented, both at the trial and at the *habeas corpus* hearing, by a representative of the Legal Aid Society. He testified that he neither understood the witnesses nor that he had a right to an interpreter. Negron's attorney and Mrs. Maggipinto testified that Mrs. Maggipinto met with Negron and his attorney during two brief recesses in the course of the three-day trial and that on these occasions Mrs. Maggipinto communicated to Negron, at least to some extent, the nature of the testimony of the English-speaking witnesses who had previously testified.[1] Negron denied that anyone ever told him the substance of the testimony of these English-speaking witnesses. Accepting the testimony of Negron's attorney and Mrs. Maggipinto, the *ex post facto* Spanish communications to Negron could not have been complete or verbatim and were hardly sufficient to satisfactorily apprise Negron of the nature and substance of the testimony against him with sufficient precision to enable him or his attorney to conduct a full, effective and contemporaneous cross-examination. As Mrs. Maggipinto testified, she was

---

1. Mrs. Maggipinto had been an interpreter in many cases and her testimony as to what happened in this particular case was not only vague but also somewhat contradictory.

"the interpreter for the prosecution" and her primary function was to interpret the testimony of the Spanish-speaking witnesses in the case. She further testified that she was not in court during all the proceedings but was present only about half a day, on the average, during the three-day trial.[2] Negron's attorney testified that he did not speak Spanish and that during a brief jail interview which constituted virtually the sum of his communication with Negron, the attorney was compelled to use the services of an interpreter.

### Right to Confrontation and Due Process

■ It is manifest that Negron, an[7] illiterate and indigent person, did not comprehend the testimony of the English-speaking witnesses during the period they were testifying. One of those witnesses, Joseph Gallardo, testified to an inculpatory statement and hence his testimony was crucial. In order to afford Negron his right to confrontation, it was necessary under the circumstances that he be provided with a simultaneous translation of what was being said for the purpose of communicating with his attorney to enable the latter to effectively cross-examine those English-speaking witnesses to test their credibility, their memory and their accuracy of observation in the light of Negron's version of the facts.

While the record reveals that several of the questions posed by the prosecutor through the interpreter to Negron made reference to portions of the testimony of Pagan and other prosecution witnesses previously adduced, this random and haphazard approach could not protect Negron from the prejudice he may have suffered by not being able to instantly cross-examine these witnesses.

This is not a case where a Spanish interpreter sat at the defense counsel table and was available for immediate consultation (Tapia-Corona v. United States, 369 F.2d 366 (9th Cir. 1966)), or where the defendant was able to afford a qualified interpreter. In United States v. Desist, 384 F.2d 889 (2d Cir. 1967), affirmed, 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed. 248 (1969), the court considered the problem of whether a French-speaking defendant had an absolute right to a free, simultaneous translation of English testimony where the request was not based upon indigency, concluding that under the circumstances presented in that case no such right existed since it was the defendant himself who was responsible for the absence of an interpreter. However, the court observed:

> "We are aware that trying a defendant in a language he does not understand has a Kafka-like quality, but Nebbia's ability to remedy that situation dissipates substantially—perhaps completely—any feeling of unease." (384 F.2d p. 902).

Nor is this a case, such as Mares v. United States, 391 F.2d 538 (5th Cir. 1968), where a defendant, who could neither speak nor understand English, was tried before a judge and represented by an attorney both of whom had a fluent command of Spanish and where the official court interpreter was required to sit with the defendant throughout the trial and to explain what was said. Where an indigent defendant has little or no understanding of English, it has been suggested that he may well be entitled, as a matter of right, to an interpreter. Gonzalez v. People of Virgin Islands, 109 F.2d 215 (3d Cir. 1940).

While there has been no federal adjudication upon this exact point, a number of State courts have recognized the right of a defendant to a court-appointed interpreter in a factual background closely akin to the present one. As aptly

---

2. The trial record reveals that at one point in the proceedings the court noticed that Mrs. Maggipinto was absent and demanded that she be called back immediately, as Negron was expected to testify.

Nevertheless, the testimony of four English-speaking witnesses for the prosecution was permitted while Mrs. Maggipinto was absent from the courtroom.

stated in Terry v. State, 21 Ala.App. 100, 101–102, 105 So. 386, 387 (1925):

> " * * * the accused must not only be *confronted* by the witnesses against him, but he must be accorded all necessary means to know and understand the testimony given by said witnesses * * *. Mere confrontation of the witnesses would be useless, bordering upon the farcical, if the accused could not hear or understand their testimony."

See also Garcia v. State, 151 Tex.Cr.R. 593, 210 S.W.2d 574 (1948); State v. Vasquez, 101 Utah 444, 121 P.2d 903 (1942); Parra v. Page, 430 P.2d 834 (Okl.Cr.1967); People v. Annett, 251 Cal.App.2d 858, 59 Cal.Rptr. 888 (1967), cert. denied, 390 U.S. 1029, 88 S.Ct. 1421, 20 L.Ed.2d 287 (1968).

■■ Negron was faced with a serious charge of murder and the rudimentary demands of a fair trial required that his Sixth Amendment rights to confrontation and effective assistance of counsel be preserved during the trial. Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). This, of course, was impossible if Negron did not know what was said against him and was unable to properly confer with his attorney. It is obvious that the court and the District Attorney were fully aware of Negron's disabilities. From the

teachings of People v. Annett, *supra*; Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), and Griffin v. People of the State of Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956), it follows that it was the duty of the State to provide Negron with a Spanish interpreter, if he so desired, and to advise him of this right in advance of his trial. On its face, People v. Ramos, 31 A.D.2d 815, 297 N.Y.S.2d 886 (1969), seems to hold to the contrary although the facts of the case do not appear in the opinion. If it is a conflicting decision, it is one to which this court cannot subscribe.

The Government urges that since the most damaging testimony came from a Spanish-speaking witness, Negron's failure to understand the English-speaking witnesses did not subject him to substantial prejudice.[3] In the context of this case it is impossible to determine from the record the extent to which Negron was prejudiced by the deprivation of his basic constitutional rights[4] and consequently it is impossible for this court to state that the error was harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

### Waiver

■ The Government contends that assuming Negron was entitled to a court-

---

3. Another factor adding to Negron's handicap during the trial relates to the crucial testimony of the Spanish-speaking witness Pagan. Negron testified upon cross-examination at his original trial and also at the hearing before this court that he was too far away to hear Pagan's testimony, which was translated to the jury in English through an interpreter. This claim is given credence by the realities of the situation where, as in the trial of this case, the interpreter approaches the witness on the stand and poses the English question in Spanish and receives an answer in Spanish which is then relayed in English to the jury. Because of the nearness of the interpreter to the witness, the Spanish portion of the translation is in a lower tone than the English portion since it is only the latter that interests the court, jury and attorneys. The defend-

ant, however, sits at the counsel table some distance away. This is precisely what happened at the hearing before this court when the testimony of the Spanish-speaking Negron was translated in English to this court. In fact, at the original trial Negron's counsel, in summation, informed the jury that his client was unable to hear what Pagan was saying in Spanish because he was speaking too softly, and that his client "did not know what most of the witnesses were saying because he doesn't understand English".

4. If one wishes to speculate, it is to be noted that Negron maintained that the homicide was accidental and occurred in the course of a struggle, and that a vigorous cross-examination of the English-speaking witnesses might have created a sufficient doubt to permit the jury to believe Negron's version.

appointed interpreter, both he and his attorney waived this right by failing to request such an interpreter. To warrant the finding of waiver it must be clearly established that there was an intentional relinquishment or abandonment of a known right or privilege. Johnson v. Zerbst, *supra,* 304 U.S. at 464, 58 S.Ct. 1019; Brookhart v. Janis, 384 U.S. 1, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966); United States v. Drummond, 354 F.2d 132 (2d Cir. 1965), cert. denied, 384 U.S. 1013, 86 S.Ct. 1968, 16 L.Ed.2d 1031 (1966); United States ex rel. Wood v. Denno, 213 F.Supp. 856 (S.D.N.Y.1963); United States v. Dillon, 183 F.Supp. 541 (S.D.N.Y.1960). The transcript is barren of any evidence to support such a finding. Upon an application for a writ of *habeas corpus* it is the obligation of this court "to look beyond forms and inquire into the very substance of the matter * * *." Frank v. Mangum, 237 U.S. 309, 331, 35 S.Ct. 582, 589, 59 L.Ed. 969 (1914). In so doing, the court must "indulge every reasonable presumption against the waiver of fundamental constitutional rights" and "must be mindful at all times of the background, experience and general conduct of the accused alleged to have waived the right," United States v. Drummond, *supra,* 354 F.2d at 148, and whether an intelligent waiver has been made depends upon the particular facts and circumstances of each case, United States ex rel. Elksnis v. Gilligan, 256 F.Supp. 244 (S.D.N.Y. 1966).

■ It is true that Negron's attorney never asked Negron whether he wished an interpreter or made a request to the court for the same, nor did Negron himself make such a request. Considering Negron's background and his total ignorance of and unfamiliarity with our legal system or the rights accorded him thereunder, his failure is clearly understandable. Similarly, it would be manifestly unjust to charge Negron's attorney with waiving this right since the courts have as of today not clearly defined this right. The flaw in the waiver argument in the present case is that the right was un-

known and accordingly there could be no intention to waive it. Therefore the court finds that neither Negron nor his attorney may be charged with a waiver. See Johnson v. Zerbst, *supra; cf.* Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), rehearing denied, 389 U.S. 889, 88 S.Ct. 13, 19 L.Ed.2d 198 (1967).

After consideration of the record below and the testimony at the *habeas corpus* hearing, the court concludes that Negron was denied his Sixth Amendment right to confrontation and that, regardless of the probabilities of· his guilt, his trial lacked the basic and fundamental fairness required by the due process clause of the Fourteenth Amendment. Under our system of justice, a procedure which offends the constitutional guaranties of the accused to a fair trial cannot be tolerated. Accordingly, Negron's application for a writ of *habeas corpus* is granted and he is hereby ordered released from custody unless he is retried or an appeal is taken from this order within 30 days from the date of the entry hereof. So ordered.