[Cite as *State v. Akladyous*, 2023-Ohio-3105.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2021-12-164 |
| | : | O P I N I O N |
| - vs - | | 9/5/2023 |
| | : | |
| ALBIR G. AKLADYOUS, | : | |
| Appellant. | : | |

CRIMINAL APPEAL FROM BUTLER COUNTY AREA III COURT
Case No. CRB 2100636

Michael T. Gmoser, Butler County Prosecuting Attorney, and Michael Greer, Assistant Prosecuting Attorney, for appellee.

Repper-Pagan Law, Ltd., and Christopher J. Pagan, for appellant.

**BYRNE, J.**

{¶ 1} Albir G. Akladyous appeals from a conviction for domestic violence in the Butler County Area III Court. For the reasons described below, we affirm.

### I. Factual and Procedural Background

### A. Complaint and Arrest

{¶ 2} On June 18, 2021, a West Chester police officer signed a complaint accusing Akladyous of first-degree misdemeanor domestic violence in violation of R.C. 2919.25. The

complaint stated that the victim—Haidy Youssef—was a family or household member, and that on June 17, 2021, Akladyous struck Youssef on her head with his fist and with water bottles, and that he also pulled her hair.

## B. The Trial

{¶ 3} On October 8, 2021, the matter proceeded to a bench trial, at which an interpreter was present for the purposes of translating Youssef's testimony. The record contains very few specific details concerning the identity, languages spoken, or other qualifications of the interpreter. We are gleaning from contextual clues in the record that the interpreter spoke and was qualified to interpret Arabic. More specifically, during the trial, the court and parties discussed that the interpreter was certified by the Ohio Supreme Court. The trial court swore the interpreter in, and the state thereafter called Youssef to testify.

### 1. State's Case – Youssef's Testimony

{¶ 4} Youssef testified that Akladyous was her ex-husband and that they had two children together. She stated that on June 17, 2021, she went to Akladyous' apartment to pick up their children. While at the apartment she was talking to Akladyous about a planned vacation to Myrtle Beach when they began arguing. Youssef eventually told Akladyous, "sorry, I need to leave." He said "no, you are not leaving now." Youssef testified that Akladyous then "sat me on the couch and he start hitting me with force. There were two jugs of water, I remember, on the side table. He lift those two jugs and hit it with force on my head in front of the kids." Their daughter was screaming and crying, asking Akladyous to stop. Youssef stated that Akladyous "was like surrounding me, cornering me."

{¶ 5} Youssef testified that she then asked Akladyous to stop and to leave. Akladyous left. Youssef went to comfort her daughter. She then went to the apartment balcony and started screaming for help. People started gathering outside the balcony. As

Youssef was screaming from the balcony, Akladyous—who had apparently returned—grabbed her hair and pulled her back to the couch. Akladyous then left the room to go speak with a neighbor. Youssef left the apartment, taking her son with her. Youssef explained that she did not take her daughter with her because her daughter wanted to stay with Akladyous to calm him down. As Youssef left the apartment, some neighbors asked her if she was okay.

{¶ 6} Youssef testified that she drove to a nearby gas station with her son. She was at the gas station, shaking and thinking about how she could get her daughter, when she realized that Akladyous' vehicle was parked next to hers. Akladyous and their daughter were in the vehicle. Akladyous asked her to pull her window down. She refused. Akladyous then called her on her cell phone. He told her to "Calm down now, we need to talk. Please do not call the cops."

{¶ 7} Youssef went home and Akladyous dropped their daughter off at Youssef's apartment. Youssef testified that Akladyous then repeated his admonition to Youssef not to call the cops, telling her, "Do not do any scandals. Don't do anything." He also said "This is your daughter." Youssef did not call the police that day. However, she went to the police and filed a report the next day.

{¶ 8} Youssef described her injuries. She testified that chewing was painful and challenging after the incident. She later went to an urgent care clinic after she filed the police report.

{¶ 9} On cross-examination, Youssef testified that the incident happened on June 16 (she had earlier testified June 17) and that she reported the incident to police the next day, June 17. Youssef also admitted that she had not previously reported driving to the gas station after the incident.

{¶ 10} Defense counsel then asked Youssef when she went to the urgent care. The

record reflects that before answering the question, Youssef began reviewing documents while on the witness stand. The parties examined these documents and found that they were Youssef's urgent care medical records, which Youssef had not provided to the state, and which, for that reason, had not been turned over to the defense.

{¶ 11} Defense counsel apparently took some time to review the records because he afterwards used them as he continued his cross-examination. Defense counsel confronted Youssef with a statement in the urgent care medical records in which she reported losing consciousness for ten minutes. In response, Youssef admitted that she had not lost consciousness and explained that she thought this incorrect information in the urgent care medical records must have resulted from the doctor misunderstanding her because her "English is not that great."

{¶ 12} There were a few instances during Youssef's testimony on direct and cross-examination when issues regarding the interpreter's translation were raised. We will discuss these instances in more detail in our analysis of Akladyous' first assignment of error.

## 2. Defense Case – Akladyous' Testimony

{¶ 13} Akladyous testified that he could understand English and that he also spoke Arabic. He stated he had listened to Youssef's exchanges with the interpreter and could "hear her answer with the Arabic language and hear the translator with English also, and there's a lot of mistakes between." He also stated that the interpreter "did not allow [Youssef] to give her answers."

{¶ 14} The state objected to Akladyous' testimony, arguing that the interpreter had been sworn and was certified by the Ohio Supreme Court. The court agreed, stating, "we're not going to go into impeachment testimony of our translator that has been sworn and certified by the Supreme Court."

{¶ 15} Akladyous then testified to the events at his apartment. According to

Akladyous, he was at his apartment with his two children when Youssef called him to ask if they could talk. He welcomed her over and Youssef came over to the apartment. She told him that she was cancelling a planned family vacation with their children. Akladyous told her that he was fine with her cancelling the vacation but asked Youssef to pay him back $600 that he had paid her towards the vacation. She refused to pay the money back, stating she needed it for a credit card payment. Akladyous was angry and said, "that's fucking bullshit." He testified that he had a bottle of water in his hand, and he threw some water on Youssef. He then went to the apartment balcony to smoke a cigarette and calm down. Akladyous testified that Youssef then came up from behind him and was screaming for people to help. He did not know why she was screaming. Youssef was loud, which caused their children to cry.

{¶ 16} Youssef then left with their son. Akladyous testified he was scared for his son, so he followed Youssef to a gas station to make sure his son was okay. He asked Youssef, "What's going on? What do you do? Why do you do that?" He asked if she behaved as she did—"mak[ing] all of this problem"—because of the vacation money. He told her that if the money was the reason, they could talk about it the next day and resolve the situation. He testified that he asked her, "why do you want to put me in this trouble?" and that she said "okay, we get together tomorrow." Akladyous then directed his daughter to go with Youssef.

{¶ 17} The next day, police arrested Akladyous at his place of employment. They told him he was being arrested for "pushing" his ex-wife.

{¶ 18} On cross-examination, the state asked Akladyous whether he spoke with any neighbors after Youssef began screaming. He denied speaking with anyone. But after further cross-examination, Akladyous admitted that some people had come "to look" and he spoke with them, telling them, "guys everything will be fine. If anyone of you want to call

- 5 -

the police, go ahead and call the police. Everything will be cool."

## C. The Verdict

{¶ 19} After Akladyous' testimony concluded, the defense rested its case, and the court stated it would take a recess. Following the recess, the court announced its decision. The court stated that it was the court's job to evaluate the credibility of the witnesses, and that after listening to the testimony, the court found Youssef credible. Accordingly, the court found Akladyous guilty of domestic violence.

{¶ 20} Akladyous appealed, raising two assignments of error.

## II. Law and Analysis

## A. Interpreter Issues

{¶ 21} Akladyous' first assignment of error states:

{¶ 22} THE INTERPRETER GAVE AN INVALID OATH, WAS NOT SHOWN TO BE A QUALIFIED ARABIC EXPERT, AND WAS NOT SUBJECT TO CONFRONTATION OVER TRANSLATION ERRORS. THE TRIAL COURT FAILED TO ADDRESS THE TRANSLATION ERRORS WITH A PROCEDURE TO EVALUATE AND CORRECT THEM.

{¶ 23} In this assignment of error, Akladyous makes multiple arguments relating to the use and conduct of the interpreter during the trial. We will address each argument in turn.

## 1. The Interpreter's Oath

{¶ 24} The court administered the following oath to the interpreter:

> Do you solemnly swear or affirm you will interpret accurately, completely and impartially using your best skill and judgment in accordance with the standards prescribed by law and follow all official guidelines established by this court for legal interpreting and translating and discharge all of the solemn duties and obligations of legal interpretation and translation?

Akladyous argues that the oath the court administered to the interpreter lacked "critical elements" that he contends were required by Sup.R. 84, Evid.R 604, and R.C. 2311.14(B).

{¶ 25} The first rule cited by Akladyous, Sup.R. 84, states:

Supreme Court certified foreign language interpreters, provisionally qualified foreign language interpreters, registered foreign language interpreters, Supreme Court certified sign language interpreters, registered sign language interpreters, and translators shall be subject to and take an oath or affirmation under which the interpreter or translator affirms to know, understand, and act in accordance with the "Code of Professional Conduct for Court Interpreters and Translators," as set forth in Appendix H to this rule.

Appendix H sets forth various "Canons" applicable to interpreters, including standards of conduct, accuracy and completeness, impartiality, representations of qualifications, and proficiency. Akladyous notes that the accuracy and completeness canon requires the interpreter to provide a "complete and accurate interpretation or translation without altering, omitting, or adding anything to what is spoken or written, and shall do so without explaining the statements of the original speaker or writer." Appendix H to the Rules of Superintendence for the Courts of Ohio, Canon 2.

{¶ 26} The second rule Akladyous cites, Evid.R 604, provides that, "An interpreter is subject to the provisions of these rules relating to qualification as an expert and the administration of an oath or affirmation to make a true translation."

{¶ 27} Third, Akladyous cites a statute, R.C. 2311.14(B), which provides in relevant part:

Before entering upon official duties, the interpreter shall take an oath that the interpreter will make a true interpretation of the proceedings to the party or witness, and that the interpreter will truly repeat the statements made by such party or witness to the court, to the best of the interpreter's ability.

{¶ 28} Akladyous argues that the oath administered by the trial court failed to comply with Sup.R. 84 because the interpreter never swore that she understood the Code set forth in Appendix H of the Superintendence Rules, including its directive that the interpreter provide a complete and accurate translation, and that the oath failed to comply with Evid.R. 604 and R.C. 2311.14(B) because the interpreter never swore that she would provide a

complete, unedited, and "true" translation.

{¶ 29} Initially, we note that Akladyous did not object at trial to the oath administered by the court. Accordingly, we review this issue for plain error. *In re M.A.P.*, 12th Dist. Butler Nos. CA2012-08-164 and CA2012-08-165, 2013-Ohio-655, ¶ 55, 59 (when defendant failed to object to failure to administer oath to interpreter at beginning of the interpreter's involvement, failure reviewed for plain error); *Solon v. Liu*, 8th Dist. Cuyahoga No. 109892, 2021-Ohio-2030, ¶ 9 (arguments regarding putatively deficient interpreter oath reviewed for plain error when defendant failed to object in trial court).

{¶ 30} Crim.R. 52(B) provides that "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." That rule "places three limitations on a reviewing court's decision to correct an error not raised before the trial court." *State v. Fuell*, 12th Dist. Clermont No. CA2020-02-008, 2021-Ohio-1627, ¶ 70, citing *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). "First, an error, 'i.e., a deviation from a legal rule,' must have occurred." *Fuell* at *id.*, quoting *Barnes* at ¶ 27. "Second, the error complained of must be plain, i.e., it must be 'an "obvious" defect in the * * * proceedings.'" *Id.* Stated otherwise, the error must be fundamental, palpable, and obvious on the record such that it should have been apparent to the court without an objection. *State v. Barnette*, 12th Dist. Butler No. CA2012-05-099, 2013-Ohio-990, ¶ 30. "Third, the error must have affected 'substantial rights.'" *Fuell* at ¶ 70, quoting *State v. Martin*, 154 Ohio St.3d 513, 2018-Ohio-3226, ¶ 28. This means the error must have affected the outcome of the trial. *Barnette* at ¶ 27. An appellate court will take notice of plain error with "utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Baldev*, 12th Dist. Butler No. CA2004-05-106, 2005-Ohio-2369, ¶ 12.

{¶ 31} We do not find that the oath administered by the trial court was deficient under

- 8 -

either Evid.R. 604 or R.C. 2311.14(B). The oath administered by the court required the interpreter to swear to provide a translation that was "accurat[e], complete[], and impartial[]." This is consistent with the requirement of Evid.R. 604 and R.C. 2311.14(B) that the interpreter provide a "true" translation or interpretation. Neither Evid.R. 604 nor R.C. 2311.14(B) mandate specific language that must be included in the interpreter's oath.

{¶ 32} But Akladyous is correct that the oath administered by the court did not comply with Sup.R. 84 because the oath did not require the interpreter to swear to "know, understand, and act in accordance with the 'Code of Professional Conduct for Court Interpreters and Translators,' as set forth in Appendix H" of the Superintendence Rules. Nonetheless, the substance of the oath administered by the court generally tracked some of the canons contained within the Code of Professional Conduct for Court Interpreters and Translators. For instance, the interpreter agreed in the oath administered by the court to "accurately, completely and impartially" discharge her duties of "interpretation and translation." This language fairly corresponds to the language of the "accuracy and completeness" canon in Appendix H.

{¶ 33} Akladyous fails to cite any authority for the proposition that plain error, much less reversible error, exists where a trial court administers an interpreter's oath that lacks an explicit reference to the Code of Professional Conduct for Court Interpreters and Translators as stated in Appendix H to Sup.R. 84. Our research revealed no such authority. In any event, it is well-settled that the "Rules of Superintendence 'do not have the same force as a statute or case law, but are rather purely internal housekeeping rules which do not create substantive rights in individuals or procedural law.'" *Hunter-June v. Pitts*, 12th Dist. Butler No. CA2013-09-178, 2014-Ohio-2473, ¶ 19, quoting *Elson v. Plokhooy*, 3d Dist. Shelby No. 17-10-24, 2011-Ohio-3009, ¶ 40. *Accord In re B.J.*, 12th Dist. Warren Nos. CA2016-05-036 and CA2016-05-038, 2016-Ohio-7440, ¶ 57. Rather, the preface to the

Superintendence Rules explains that those rules were adopted to ensure the "prompt disposition of all causes, at all times, in all courts of this state." Sup.R. Preface. Accordingly, noncompliance with a Rule of Superintendence is generally not grounds for reversal. *Id.*

{¶ 34} Even if the failure to refer to the Code of Professional Conduct for Court Interpreters and Translators were error, we find no evidence in the record to support the conclusion that such error changed the outcome in the case to support a plain error finding and reversal. That is, nothing in the record suggests that the interpreter would have performed her duties any differently had the court provided an oath that referred to the Code of Professional Conduct for Court Interpreters and Translators. We agree that the court should have complied with the Superintendence Rules and strongly recommend that all trial courts take the time to ensure that their procedures are compliant. But here, we cannot find any evidence in the record to support the conclusion that the oath affected the outcome at trial or affected Akladyous' substantial rights. In the absence of such a finding, we cannot find plain error. *Barnette*, 2013-Ohio-990 at ¶ 27 (error must have affected defendant's substantial rights to constitute plain error). Therefore, Akladyous has not established plain error with respect to the oath given to the interpreter.

### 2. Interpreter's Credentials

{¶ 35} Akladyous next argues that it was error for the interpreter to fail to place her experience, knowledge, and training on the record as he argues is required by the Code of Professional Conduct for Court Interpreters and Translators set forth in Appendix H to Sup.R. 84. Akladyous failed to object or raise this argument before the trial court, so we review this issue for plain error. *In re M.A.P.*, 2013-Ohio-655 at ¶ 55, 59; *Solon*, 2021-Ohio-2030 at ¶ 9.

{¶ 36} Akladyous cites no legal authority requiring an interpreter to affirmatively

place her experience, knowledge, and training on the record. Akladyous cites the Code of Professional Conduct for Court Interpreters and Translators. But upon our review we have located no canon requiring an interpreter to affirmatively place her experience, knowledge, and training on the record. The closest we can find to such a requirement is found in Canon 5 of the Code, titled "Representation of Qualifications." Canon 5 provides that the interpreter "shall accurately and completely represent their credentials, certifications, training, references, and pertinent experience." But Canon 5 does not explicitly state the context in which this obligation applies. The commentary to Canon 5 suggests Canon 5's obligations apply to an interpreter when seeking appointment. Perhaps the canon also applies when an interpreter appears in court. But even if that is the case, the canon simply requires the interpreter to honestly answer questions about the interpreter's qualifications, and does not impose on the interpreter an obligation to affirmatively describe her credentials on the record, without being questioned regarding those credentials. Neither Akladyous' counsel nor the prosecutor questioned the interpreter about her credentials on the record, so the interpreter did not have the opportunity to state her credentials on the record. Akladyous has not identified an error. *Fuell*, 2021-Ohio-1627 at ¶ 70. And Akladyous fails to articulate how the interpreter's failure to place her qualifications of record prejudiced him in this case, and so even if there were error, we could not find plain error. *Id.*

### 3. Interpreter's Identity

{¶ 37} Akladyous next complains that the interpreter did not place her identity on the record so that it could be verified as to whether she was certified by the Ohio Supreme Court. Akladyous cites Sup.R. 86 in support. That rule provides that the Supreme Court Language Services Program shall maintain a roster of all Supreme Court certified foreign language interpreters. Sup.R. 86, however, does not stand for the proposition that it is error for an interpreter not to place their identity on the record. Instead, the rule simply creates

an administrative requirement within the Ohio Supreme Court for a roster of certified interpreters.

{¶ 38} The trial court in this case noted on the record that the interpreter was a certified interpreter from the Ohio Supreme Court. Akladyous did not challenge that assertion in any way during trial.[1] Akladyous presents no citation to the record to suggest that the interpreter was not certified by the Ohio Supreme Court. Nor did Akladyous make any objection with regard to the interpreter's identity or status as an interpreter certified by the Ohio Supreme Court. We find no obvious error that would support a finding of plain error. *Fuell* at ¶ 70; *In re M.A.P.*, 2013-Ohio-655 at ¶ 55, 59; *Solon,* 2021-Ohio-2030 at ¶ 9.

## 4. Due Process and Confrontation Rights

{¶ 39} Next, Akladyous argues that the trial court denied him his procedural and substantive due process rights and his "confrontation right." In making this argument, Akladyous does not cite the specific constitutional provisions on which he relies. It is therefore unclear whether Akladyous' reference to "due process" is a reference to the due process clauses in the Fifth Amendment and the Fourteenth Amendment to the United States Constitution, to the "due course of law" clause in Section 16 of Article I of the Ohio Constitution, or to both.[2] It is also unclear whether Akladyous' reference to the right to confront witnesses is a reference to that right as guaranteed by the Sixth Amendment to

---

1. Not only did Akladyous not challenge the assertion that the interpreter was certified with the Ohio Supreme Court, at one point during the trial, defense counsel specifically noted his lack of concerns with the interpreter, despite some of the purported translation issues, stating that he viewed the interpreter as the "voice of this witness" and that it was not "personal for the interpreter."

2. The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law * * *." Article I, Section 16 of the Ohio Constitution provides that, "every person * * * shall have remedy by due course of law * * *."

the United States Constitution, to Section 10 of Article I of the Ohio Constitution, or to both.[3]

This omission would normally be quite problematic, as App.R. 16(A)(7) requires that an

appellant's brief contain,

> An argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, *with citations to the authorities*, statutes, and parts of the record *on which appellant relies*."  (Emphasis added.)

*See Fontain v. H&R Cincy Properties, L.L.C.*, 12th Dist. Warren No. CA2021-02-015, 2022-Ohio-1000, ¶ 87 (noting that appellant failed to explain arguments under Fifth, Sixth, and Fourteenth Amendments, and declining to find violation of same because "it is [appellant's] obligation to demonstrate error on appeal").

{¶ 40} However, in this particular case, Akladyous' lack of specificity does not hamper our review of his due process and confrontation arguments.  This is because the Ohio Supreme Court has found that the federal Due Process Clause and the Ohio Due Course of Law Clause provide equivalent due process protections even though the two clauses use different language.  *State v. Aalim*, 150 Ohio St.3d 489, 2017-Ohio-2956, ¶ 15; *State v. Hand*, 149 Ohio St.3d 94, 2016-Ohio-5504, ¶ 11.  Likewise, the Ohio Supreme Court has held that the confrontation rights provision in Section 10 of Article I of the Ohio Constitution "provides no greater right of confrontation than the Sixth Amendment" to the United States Constitution.  *State v. Self*, 56 Ohio St.3d 73, 79 (1990).  *Accord State v. Arnold*, 126 Ohio St.3d 290, 293 (2010).

{¶ 41} Akladyous argues that his due process and confrontation rights were denied when the interpreter and Youssef had conversations during trial that the interpreter failed to translate, and when the court prevented him from testifying or questioning the interpreter

---

3. The Sixth Amendment provides that "In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him * * * ."  Section 10 of Article I of the Ohio Constitution states, "In any trial, in any court, the party accused shall be allowed * * * to meet the witnesses face to face * * *."

regarding alleged translation errors.

**{¶ 42}** In support of his due process argument regarding untranslated conversations, Akladyous cites a single case, *B.C. v. Atty. Gen.*, 12 F.4th 306 (3d Cir.2021). In that case an asylum seeker from Cameroon who spoke Pidgen English, rather than Standard English, was not questioned about his understanding of Standard English and was not provided with an interpreter during immigration removal proceedings. *Id.* at 310. The United States Court of Appeals for the Third Circuit held that "due process requires [immigration judges] to determine whether a noncitizen has a sufficient level of proficiency in "Standard" English to proceed without an interpreter." *Id.* at 314.

**{¶ 43}** But in the case before us, Akladyous did not need or request an interpreter, and he does not argue on appeal that the court should have inquired further into his understanding of English. (In fact, the court did so inquire.) Nor is there any argument on appeal that Youssef's rights were violated because the court failed to inquire further regarding her translation needs. For these reasons the Third Circuit's *B.C.* decision is simply not relevant to Akladyous' argument regarding alleged untranslated conversations between Youssef and the interpreter and alleged translation errors.

**{¶ 44}** In support of his confrontation right argument, Akladyous cites the fourth paragraph of *Columbus v. Lopez-Antonio*, 153 Ohio Misc.2d 4, 2009-Ohio-4892 (M.C.) for the proposition that a defendant's confrontation rights are violated where a witness has untranslated conversations with an interpreter during cross-examination and when he is denied the right to cross-examine with respect to those conversations and/or explain purported translation errors he hears. But *Lopez-Antonio* does not address these issues. Instead, the fourth paragraph of *Lopez-Antonio* states that rights to confrontation and effective assistance of counsel are violated when a person with a limited proficiency in English "does not understand the testimony offered against him and is unable to properly

confer with his attorney." *Id.* at ¶ 4, citing *United States ex rel. Negron v. New York*, 310 F.Supp. 1304 (E.D. N.Y. 1970). Akladyous does not claim that he could not understand the testimony offered against him as translated by the interpreter. In fact, he testified he understood both Youssef's Arabic testimony and the English translation. Accordingly, we find *Lopez-Antonio* irrelevant to the matter before us.[4]

{¶ 45} Akladyous characterizes *B.C.* and *Lopez-Antonio* much more broadly than their actual holdings. But even if *B.C.* and *Lopez-Antonio* stood for the propositions Akladyous asserts, reversal is not required in this case for the reasons that follow.

{¶ 46} First, Akladyous complains that the interpreter, in several instances, used the word "Basically" before providing Youssef's response to questions asked of her during trial. Akladyous' counsel objected, explained his concern that "Basically" was the interpreter's way of indicating that she was summarizing Youssef's testimony, rather than simply translating it. In response to this objection the court asked the interpreter what she meant by using the word "Basically" at the beginning of her translations of Youssef's statements. The interpreter then indicated that "basically" was a "sequence of speech" such as "hence, therefore, [or] otherwise" and that the words being translated were "the facts that happened inside the apartment." While it is not clear whether the interpreter's response was fully responsive to the court's question—because the interpreter did not explicitly explain whether she had been summarizing Youssef's testimony—Akladyous' counsel was apparently satisfied with the explanation because he did not ask any follow-up questions or even indicate that the interpreter's answer to the court's question was unsatisfactory. Testimony simply resumed, without objection. And after Akladyous' objection to the use of the term "basically," the interpreter stopped using that term and there were no further

---

4. Even if *Lopez-Antonio* were not irrelevant to the issues before us, it is a decision of the Franklin County Municipal Court, and thus is not controlling precedent in this district.

objections. In these circumstances, where counsel received an answer to his concerns and did not follow up, there is no evidence in the record establishing that the interpreter was paraphrasing. Based on a lack of evidence in the record, we find that Akladyous has not demonstrated a denial of his right to due process of law. Nor has he demonstrated prejudice.

{¶ 47} Second, Akladyous complains that the trial court threatened him with contempt when he pointed out untranslated conversations between the interpreter and Youssef. But Akladyous ignores the full context in which the trial court threatened him with contempt. During a portion of Youssef's cross-examination, defense counsel asked whether Youssef's daughter was scared to leave Akladyous' apartment with her. Youssef agreed that her daughter was afraid. The court then stated that it could not hear Youssef, apparently because Akladyous was speaking during Youssef's testimony. The court instructed Akladyous to stop talking. Akladyous responded that, "I understand the translation, she say to her --." The court advised Akladyous that he was not testifying at that time, warned him against interrupting Youssef's testimony, and warned him that he would be held in contempt if he interrupted again. Defense counsel told Akladyous to "Stop." Akladyous apologized. Akladyous' counsel then noted for the record that Youssef had answered "in length" his question about whether her daughter was afraid to go with her but that this answer had not been translated back by the interpreter. Akladyous' counsel then questioned Youssef again, asking what answer she had provided to the interpreter. The state objected, arguing that Youssef could not testify as to the daughter's reasons for why she would or would not leave with Youssef. The court sustained the objection on that basis.

{¶ 48} As this summary makes clear, the court did not restrict defense counsel from questioning Youssef and/or the interpreter regarding untranslated answers, but rather

restricted counsel from questioning Youssef about her daughter's state of mind. The court determined that any answer Youssef may have given to that question was beyond her personal knowledge and therefore sustained the state's objection. Whether that decision was the correct decision or not, Akladyous has not challenged that ruling. Accordingly, we find no error here and no basis for concluding that Akladyous' constitutional rights were denied. This is not a case where the trial court placed "improper restrictions on the types of questions that defense counsel may ask during cross-examination." *Pennsylvania v. Ritchie*, 480 U.S. 39, 52, 107 S.Ct. 989 (1987). Furthermore, the trial court's ruling did not restrict defense counsel from asking further questions about untranslated conversations, and it was defense counsel who chose to abandon that line of questioning.

{¶ 49} Even if we assume that the trial court erred with regard to its handling of the interpreter's use of the term "Basically" and erred when it sustained the state's objection as to Youssef testifying as to her daughter's state of mind, we still could not find plain error with respect to these incidents because Akladyous has not demonstrated any possibility of a changed outcome. *State v. West*, 168 Ohio St.3d 605, 2022-Ohio-1556, ¶ 22; *State v. Hill*, 92 Ohio St.3d 191, 203 (2001). The first instance of the interpreter using the word "basically" occurred after Youssef testified to the salient aspects of the water jug attack. And the testimony concerning whether the daughter was scared or not occurred during cross-examination and was largely irrelevant to the case. Nor can Akladyous claim that interpretation issues pervaded Youssef's testimony. We know this because Akladyous' testimony corroborated nearly all of Youssef's translated testimony. For instance, Akladyous' testimony corroborated that (1) Youssef came to his apartment, (2) an argument ensued regarding a vacation, (3) he held a bottle of water and used it against her in anger, (4) Youssef screamed for help from neighbors, (5) the children began crying during the incident, (6) he talked to concerned neighbors, (7) he followed Youssef to a gas station,

and (8) he made comments to her about her getting him in trouble.

**{¶ 50}** The only actual discrepancy between their stories was that Akladyous claimed that he merely threw water on Youssef while Youssef claimed that he struck her with water jugs and later forced her back into the apartment by her hair. But Akladyous never claimed that the interpreter mistranslated any testimony concerning these issues and there is no evidence before us to substantiate such a mistranslation. Thus, even if Akladyous demonstrated that the court erred in restricting cross-examination of the interpreter and with respect to alleged untranslated conversations between the interpreter and Youssef, there is no evidence to demonstrate any changed outcome. *West* at ¶ 22; *Hill* at 203.

**{¶ 51}** Third, Akladyous complains about the following exchange that occurred at the start of his testimony:

> [Defense Counsel]: You could hear [Youssef's] answers?
>
> [Akladyous]: I hear – I hear her answer with the Arabic language and hear the translator with English also, and there's a lot of mistakes between.
>
> [Defense Counsel]: Okay. You heard her answers being in English and also Arabic, is that correct?
>
> [Akladyous]: Yes.
>
> [Defense Counsel]: I do not speak Arabic. Do you?
>
> [Akladyous]: Yes.
>
> [Defense Counsel]: And could you understand her answers in both English and in Arabic?
>
> [Akladyous]: Yes.
>
> [Defense Counsel]: And what were—did you hear the answers of the translator?
>
> [Akladyous]: Yes.
>
> [Defense Counsel]: Could you hear the translator and her having a conversation?

[Akladyous]:  Yes.

[Prosecuting Attorney]:  Your Honor, I'm going to object where he's going with this. The translator was sworn in and she did, I believe—

[Akladyous]:  She did not allow to give her answers.

[The Court]:  Sir, you are not going to talk over the attorneys in this room.

[Akladyous]:  I'm sorry.

[The Court]:  You are just not going to do that.  Give me just a second.  This is the second time I've had to talk to you about this.

[Akladyous]:  I apologize.

[The Court]:  I know this is emotional.  I know you have kids involved and there's a lot on the line, but you are going to let these people do their jobs and you are going to answer questions when you are asked, okay?

[Akladyous]:  Sure.  I'm sorry.

After Akladyous apologized for his interruption, the prosecutor resumed his explanation of his objection:

> [Prosecutor]:  I am objecting to the line of questioning here.  The interpreter was sworn in and she's here from the Supreme Court and she's certified.  And I don't understand how we can allow him to state what the witness said via translation.
>
> [Defense Counsel]:  I didn't ask that.  I just asked if he heard it.
>
> [The Court]:  If he heard it yes or no is the question, but we're not going to go into impeachment testimony of our translator that has been sworn and certified by the Supreme Court.

Defense counsel then resumed questioning Akladyous, focusing on Akladyous' recollection of the key events at his apartment.

{¶ 52} To the extent Akladyous argues that the trial court denied his due process and confrontation rights during this exchange, we must review this issue for plain error.  Once

- 19 -

the prosecutor explained his objection, defense counsel did not disagree with the objection. Nor did he indicate that he planned to explore translation errors. Instead, defense counsel merely stated, "I didn't ask that. I just asked if he heard it." Then, when the court sustained the prosecutor's objection and stated, "we're not going to go into impeachment testimony of our translator that has been sworn and certified by the Supreme Court," Akladyous' counsel did not object on any basis whatsoever, let alone on the basis that Akladyous' due process and confrontation rights were being denied. Defense counsel simply acceded to the court's ruling and continued testimony, without ever stating that he intended to explore alleged translation errors.[5]

{¶ 53} Upon our review, we have concerns grounded in fundamental fairness and due process regarding the arbitrary manner in which the trial court summarily denied Akladyous the ability to testify concerning alleged translation errors. Evid.R. 402 provides that all relevant evidence is admissible. Evid.R. 401 provides that relevant evidence is that which has "*any* tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." (Emphasis added.)

{¶ 54} Akladyous testified that he spoke both English and Arabic. Claimed translation errors occurring during the prosecution witness' testimony are plainly relevant to Akladyous' defense where the case essentially pitted one individual's testimony against another. And simply because an interpreter is "certified" to interpret by the Ohio Supreme Court does not make that individual infallible or incapable of mistake. At a minimum, and even if the court declined to ultimately admit Akladyous' testimony or gave it little weight, the court should have permitted Akladyous to make a record of his claims to preserve the

---

5. Akladyous' counsel also did not proffer the testimony that Akladyous would have potentially given regarding alleged translation errors.

issue for appellate review.

{¶ 55} Nonetheless, under the specific circumstances of this case, we do not find that Akladyous was denied due process. Akladyous is not claiming that translation errors pervaded Youssef's testimony. His testimony corroborated nearly all of Youssef's testimony and Akladyous never claimed any mistranslation concerning the most important aspects of Youssef's testimony that differentiated from his own, i.e., the physical assault. We agree that the trial court erred in summarily restricting Akladyous' testimony in the manner it did but we do not find any possibility of a changed outcome. We find no plain error.

{¶ 56} For the foregoing reasons, we overrule Akladyous' first assignment of error.

**B. Cumulative Error, Ineffective Assistance of Counsel, and Due Process**

{¶ 57} Akladyous' second assignment of error states:

{¶ 58} THERE WERE CUMULATIVE ERRORS THAT DEPRIVED AKLADYOUS OF HIS RIGHTS TO EFFECTIVE ASSISTANCE AND DUE PROCESS UNDER THE FEDERAL AND OHIO CONSTITUTIONS.

{¶ 59} Akladyous points to various errors he alleges occurred throughout his criminal prosecution which involved the denial of his constitutional rights (including but not limited to ineffective assistance by his trial counsel) and which, when considered cumulatively, establish prejudice necessitating a new trial.

**1. Standards of Review**

{¶ 60} Under the doctrine of cumulative errors, a reviewing court "will reverse a conviction when the cumulative effect of errors deprives a defendant of a fair trial even though each of the instances of trial-court error does not individually constitute cause for reversal." *State v. Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1966, ¶ 140.

{¶ 61} To prevail on an ineffective assistance of counsel claim, Akladyos must show his defense counsel's performance was deficient, and that he was prejudiced as a result. *State v. Clarke*, 12th Dist. Butler No. CA2015-11-189, 2016-Ohio-7187, ¶ 49; *Strickland v.*

*Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052 (1984). Defense counsel's performance will not be deemed deficient unless it fell below an objective standard of reasonableness. *Strickland* at 688. To show prejudice, Akladyous must establish that, but for his trial counsel's errors, there is a reasonable probability that the result of his trial would have been different. *Id.* at 694. The failure to satisfy either prong of the *Strickland* test is fatal to an ineffective assistance of counsel claim. *Clarke* at ¶ 49. We strongly presume that defense counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *State v. Burns*, 12th Dist. Clinton No. CA2013-10-019, 2014-Ohio-4625, ¶ 7. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence * * *." *Strickland* at 689.

{¶ 62} We review claimed constitutional errors de novo. *State v. Taylor*, 135 Ohio App.3d 182, 184-185 (12th Dist.1999). Unless otherwise indicated, all errors described below were not objected to and are subject to the plain-error analysis described earlier in this opinion. Crim.R. 52(B).

## 2. Pretrial Errors

### a. "Temporary Warrant" Arrest

{¶ 63} Akladyous first argues that officers seized him on a "temporary warrant." That is, Akladyous asserts that he was arrested by a police officer prior to the issuance of a warrant supported by probable cause determined by a suitable person under Crim.R. 4(A). Akladyous argues that such a procedure violated his Fourth Amendment rights, his rights under Article I, Section 10 of the Ohio Constitution, and Crim.R. 4(A)(1).

{¶ 64} The complaint was dated June 18, 2021 and appeared to have been signed on that day by both a police officer and a deputy clerk. The warrant, however, indicates the deputy clerk signed it on June 21, 2021. Further compounding the confusion, neither the complaint nor the warrant were time-stamped as filed with the clerk of court's office until

June 21.

**{¶ 65}** The record appears to confirm that Akladyous entered the custody of the Butler County Sheriff's Office on June 18, 2021, several days before the signing or issuance of the warrant. In sum, the record is not clear when the first probable cause finding was made, or whether the arresting officer had "reasonable cause" to arrest Akladyous without a warrant pursuant to R.C. 2935.03(B)(1).

**{¶ 66}** Assuming without deciding that Akladyous' arrest was illegal, case law is clear that such arrest would not invalidate his otherwise proper, subsequent conviction. *State v. Henderson*, 51 Ohio St.3d 54, 55-56 (1990) (citing cases in support). Evidence obtained because of an illegal arrest is inadmissible at trial. *Id.* at 56. However, no evidence obtained via Akladyous' arrest was submitted against him at trial. Accordingly, we find no error in this regard.

### b. Length of Detention Before Probable Cause Finding

**{¶ 67}** Akladyous next argues that he was detained for more than 48 hours before the municipal court made a probable cause finding. He argues that a "Sheriff's Booking Form" indicates that he was processed into the jail at 1:46 p.m. on June 18, 2021 but that he did not appear before the court for a probable cause finding until the morning of June 21, 2021. Though Akladyous references the "Sheriff's Booking Form" in his appellate brief, it is not in the record on appeal.

**{¶ 68}** In *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854 (1975), the United States Supreme Court held that a person arrested without a warrant is constitutionally entitled to a judicial determination of probable cause either before or promptly after arrest. *Id.* at 124-125. In *Riverside v. McLaughlin*, 500 U.S. 44, 111 S.Ct. 1661 (1991), the Supreme Court articulated that judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement of *Gerstein. Id.* at 56. Neither

*Gerstein* nor *McLaughlin* addressed the appropriate remedy when a probable cause determination has not been made "promptly."

{¶ 69} However, in *Gerstein*, the court stated that it was not retreating from the "established" rule that an illegal arrest or detention does not void a subsequent conviction. *Gerstein* at 119. Thus, the court held that a suspect who is presently detained may challenge the probable cause for that confinement, but that "a conviction will not be vacated on the ground that the defendant was detained pending trial without a determination of probable cause." *Id.*

{¶ 70} Assuming for the sake of argument that Akladyous was in fact improperly detained for more than 48 hours before a probable cause finding was made, such argument would not invalidate his subsequent conviction pursuant to *Gerstein*.

### c. Requiring the Payment of Court Costs with Bail

{¶ 71} The court set Akladyous' bond at $1,000 plus $150 in court costs at a probable cause hearing on June 21, 2021. The record reflects that Akladyous paid the required bond and was subsequently released pending trial. Akladyous contends that the court erred by including court costs in the total bond. Without citation to authority, Akladyous argues that he "cannot be required to pay court costs for the State's prosecution unless convicted" and that the "prepayment of court costs leverages the defendant's rights and liberty for the court's finances * * *."

{¶ 72} Assuming without deciding that it is error to require the payment of court costs in conjunction with bail, it is well established that once a defendant has been convicted, any issue concerning pretrial bail is moot. *State v. Smith*, 12th Dist. Butler No. CA2020-09-101, 2021-Ohio-2982, ¶ 48, citing *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, ¶ 206. Accordingly, we find that this issue is moot.

### 3. Trial Errors

### a. Interpretation Issues

{¶ 73} Akladyous refers to the arguments concerning the translation issues he raised in his first assignment of error. For the reasons set forth previously, we find no merit to those arguments.

### b. Suggestive In-Court Identification Procedure

{¶ 74} Akladyous next argues that the trial court erred in using an overly suggestive in-court identification procedure. At the end of her direct testimony, the state asked Youssef whether Akladyous was in the courtroom. She responded "I think so. I saw him. Yes, he's here." The state then asked Youssef whether she could find and point to Akladyous and describe what he was wearing. The court then instructed Akladyous to stand up. The state then again asked Youssef whether she could point to Akladyous and describe what he was wearing. Youssef then agreed with the state's suggestion that Akladyous was the person at the defendant's table wearing an Adidas shirt and that he was the same person she had described earlier in her testimony.

{¶ 75} Impermissibly suggestive identification procedures that produce unreliable identification testimony are excludable under the Due Process Clause of the United States Constitution. *State v. Myers*, 153 Ohio App.3d 547, 2003-Ohio-4135, ¶ 30. The concern is that suggestive identification procedures increase the likelihood of misidentification. *Id.* The critical inquiry is whether under the totality of the circumstances the identification was reliable even though the confrontation procedure was suggestive. *Id.*

{¶ 76} We agree that what occurred here—that is, where the court instructs the defendant to stand immediately after the state asks the witness to identify the alleged perpetrator, and then the state leads the witness in describing what the defendant was wearing—would constitute an impermissibly suggestive identification procedure.

{¶ 77} Here, however, Akladyous' identity was not at issue. Youssef testified that

Akladyous was the person who struck her and pulled her hair. She further testified that she was Akladyous' ex-spouse and the mother of two of his children. Youssef's testimony established that she was extremely familiar with Akladyous. Akladyous, for his part, did not dispute that Youssef was his ex-wife or that she was physically present in his apartment during the key events at issue in this case. An in-court identification was not necessary for the state to prove identity and was essentially a needless formality. The flippant identification procedures used and the lack of an objection from defense counsel appears to underscore this latter point. Accordingly, we do not find that Akladyous has demonstrated plain error in this regard.

### c. Urgent Care Records

{¶ 78} Akladyous contends that the trial court erred by permitting Youssef to review her urgent care records while testifying because the records were not disclosed in discovery and because she did not otherwise demonstrate a need to refresh her memory.

{¶ 79} Defense counsel, while cross-examining Youssef, noted that she was looking at notes after being asked a question regarding when she visited an urgent care. The court then announced that if Youssef was looking at notes to refresh her collection, defense counsel would have a right to examine the notes. Defense counsel then reviewed the notes and indicated that the documents had been requested but were never produced. The court then stopped the testimony, and it appears that both defense counsel and the state reviewed the urgent care records.

{¶ 80} Defense counsel then continued his cross-examination. Youssef confirmed she had not provided the records to the state, explaining that she did not believe she had to provide them. Defense counsel cross-examined Youssef on statements that she made to the urgent care medical staff which she admitted were not true, including what time she went to the police station and her statement to urgent care medical staff that she had fallen

unconscious during the attack.

{¶ 81} Upon review, we find no plain error in the trial court's decision to permit the use of the urgent care records. The record suggests that Youssef attempted to use the undisclosed records to refresh her recollection while testifying. The trial court thereafter, and consistent with Evid.R. 612, ruled that Akladyous' defense counsel would be entitled to inspect and cross-examine Youssef on those records, which he did.

{¶ 82} The court did not sua sponte exclude the records from the trial due to an alleged discovery violation. But defense counsel did not ask the court to quash the records. And for good reason. Defense counsel was able to use the records to impeach Youssef's credibility.

{¶ 83} Akladyous further contends that his trial counsel provided ineffective assistance by failing to move for or claim a *Brady* violation and then move for a continuance of the trial. However, for the reasons described above, a continuance was unnecessary. Defense counsel was able to review the records and effectively cross-examine Youssef on the contents. Defense counsel's performance was not deficient.

{¶ 84} Finally, Akladyous claims that defense counsel provided defective performance by failing to mark the urgent care medical records and preserve them for appellate review. However, Akladyous' claim here is entirely speculative. That is, without knowing the content of the records, it would be entirely speculative for this court to find a different outcome on appeal had they been identified as an exhibit or otherwise proffered into the record. We find that Akladyous has failed to demonstrate plain error or ineffective assistance regarding the undisclosed urgent care records. *West*, 2022-Ohio-1556 at ¶ 22; *Hill*, 92 Ohio St.3d at 203; *Clarke*, 2016-Ohio-7187 at ¶ 49.

**d. Closing Argument**

{¶ 85} Akladyous argues that the trial court erred by failing to permit him to conduct

closing argument. Following the defense case, the trial court announced it would take a 10-minute recess. Immediately upon returning from the recess, the court announced its verdict. The court did not ask either the state or the defense whether they would like to make a closing argument. Neither side asked to present closing argument before, during, or after the court's announcement of its decision. Neither side objected to the lack of an opportunity for closing argument.

{¶ 86} In *State v. McCausland*, 124 Ohio St.3d 8, 2009-Ohio-5933, the Ohio Supreme Court noted that a final argument in either a jury or a bench trial is a basic right of the accused to make in his defense. *Id.* at ¶ 6. However, the court also found that no plain error existed where the defendant "had the opportunity to present a closing argument but waived his right to closing argument when he failed to request it and failed to object to its omission." *Id.* at ¶ 15. The court found no plain error because there was no indication that the outcome of the trial would have been different. There were only two witnesses, the issues were simple, and the trial was brief. *Id.*

{¶ 87} Upon review of the record, we do not believe that Akladyous had a feasible opportunity to request a closing argument. Upon returning from recess, the trial court immediately began discussing its decision with no prefatory statements. Defense counsel could have interrupted the court but may have decided that discretion advised against such a choice. Counsel may also have felt that the court's actions implicitly indicated that no closing argument was necessary. Significantly, this was a relatively simple case with only two witnesses, and the case was tried to the bench, not to a jury.

{¶ 88} Regardless, we find no plain error here because we find no indication that the outcome of the trial would have been different had defense counsel been permitted closing remarks. This trial came down to credibility. While both parties had credibility issues that were explored at trial, the issues with Akladyous' credibility were obvious. His version of

events mimicked Youssef's but for those facts that could inculpate him. And Akladyous' attempts to explain those discrepancies made his testimony far less credible. Therefore, we do not find any reasonable probability of a changed outcome but for defense counsel providing a closing argument. *West*, 2022-Ohio-1556 at ¶ 22; *Hill*, 92 Ohio St.3d at 203.

### 4. Post-Trial Errors

{¶ 89} Finally, Akladyous alleges the trial court erred when it failed to record his sentencing hearing. A copy of the transcript of the sentencing hearing was not included in the record on appeal and Akladyous' appellate counsel represents that neither he nor the court reporter could locate a copy of the sentencing hearing in the court's system and that the court reporter confirmed the hearing was unrecorded.

{¶ 90} We find no error here by the trial court. Pursuant to App.R. 9(B), Akladyous had the burden to ensure that the proceedings necessary for inclusion in the record were transcribed in the appropriate format. App.R. 9(B)(4) specifies that if there was no recording made, the appellant may use the procedures set forth in App.R. 9(C) or 9(D) to reconstruct the record.

{¶ 91} In *State v. Crouse*, 12th Dist. Fayette No. CA98-10-016, 1999 WL 1123027 (Dec. 6, 1999), we addressed a situation where almost the entire sentencing hearing was unrecorded. *Id.* at *10. We observed that under such circumstances, the appellant could meet his burden under App.R. 9 by other suitable alternatives in proper compliance with the appellate rules. *Id.* Here, Akladyous never attempted to use App.R. 9(C) or (D) to meet his burden of supplying this court with a record of the sentencing hearing. Accordingly, Akladyous did not meet his burden under App.R. 9.

{¶ 92} Akladyous nevertheless cites *State v. Clinkscale*, 122 Ohio St.3d 351, 2009-Ohio-2746, ¶ 12-20, for the proposition that reversible error exists "where a trial court fails to record the proceedings involving a constitutional right." However, *Clinkscale* was a

capital case and the omissions in the record related to the dismissal and replacement of a deliberating juror. *Id.* at ¶ 15. Moreover, the parties in that case attempted to address the deficiency in the record through App.R. 9. *Id.* at ¶ 16. Therefore, we find *Clinkscale* distinguishable.

{¶ 93} Because Akladyous has not demonstrated that the cumulative effect of any errors that occurred at his trial denied him a fair trial, the cumulative error doctrine is inapplicable. We overrule Akladyous' second assignment of error.

### III. Conclusion

{¶ 94} For the foregoing reasons we overrule all of Akladyous' assignments of error. We note that while the law does not require us to reverse Akladyous' convictions based on the precise circumstances in this case, the trial court should note the problems identified in this opinion and adjust its practices accordingly.

{¶ 95} Judgment affirmed.

PIPER, P.J., and HENDRICKSON, J., concur.